24 A.3d 135

**STATE of Maryland**

v.

**Vincent GRECO, Jr.**

**No. 2343, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

July 7, 2011.

648

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellant.

Christopher R. Hart (Jon R. Fetterolf, Andrew T. Boone, Williams & Connolly LLP, Washington, D.C., and Howard

Cardin, Cardin & Gitomer, Baltimore, on the brief), for appellee.

Panel: EYLER, JAMES R., MEREDITH, IRMA S. RAKER (Retired, Specially Assigned), JJ.

IRMA S. RAKER (Retired, Specially Assigned), J.

This is a State appeal from the grant of post-conviction relief to appellee Vincent Greco, Jr., pursuant to Maryland Code (2001, 2008 Repl.Vol., 2010 Cum.Supp.) § 7–106(c) of the Criminal Procedure Article.[1] The Circuit Court for Baltimore County vacated the judgment of conviction for the offense of first degree murder, and granted appellee a new trial on that offense.[2] The State filed an application for leave to appeal, presenting a single question:

> "Did the circuit court err in granting post-conviction relief under Section 7–106(c) of the Criminal Procedure Article, based on the improper retroactive application of a non-constitutional evidentiary standard that was not intended to be applied retroactively?"

Greco presents two additional issues in his brief, questioning the jurisdiction of this Court to hear this State's appeal and the preservation of certain arguments in the State's brief.[3]

---

**1.** Unless otherwise noted, all subsequent statutory references herein shall be to the Maryland Code (2001, 2008 Repl.Vol., 2010 Cum.Supp.) § 7–106(c) of the Criminal Procedure Article.

**2.** The circuit court's original order granted post-conviction relief to appellee without specifying which convictions were granted a new trial, as Greco was convicted of rape and felony murder, but the circuit court clarified its order, ruling that only the first degree murder conviction should be vacated.

**3.** Greco presents an additional question regarding the legality of the sentence imposed by the trial court when it resentenced him on the rape and felony murder convictions on September 27, 2010. Because we shall hold that the circuit court erred in granting Greco the post-conviction relief on the first degree murder conviction, the resentencing on the other convictions necessitated by that relief becomes a nullity. This Court, therefore, does not need to address whether this question is properly before it, whether the trial court had jurisdiction to resentence

We shall hold that this Court does have jurisdiction to hear this appeal, that the State did not waive its challenge to the applicability of § 7–106(c), and that the circuit court erred in granting Greco post-conviction relief under § 7–106(c).

## I.

This case has a long history in the courts. We set forth the facts as set out by this Court in Greco's direct appeal in *Greco v. State*, No. 1671, Sept. Term 1982, unreported (Md. Ct. Spec.App. June 23, 1983):

"Greco was tried for killing 78 year old Leta Jeanette Larsen who he allegedly beat brutally before he strangled and raped her in her living room on April 17, 1981.

On the eve of Larsen's death, Greco, who had steadily dated Larsen's granddaughter, Sheryl Fitch, received a call from Larsen. She allegedly told Greco that she did not want him to continue to date her granddaughter. Larsen expressed concern over Greco's use of drugs and alcohol. That night, at approximately 9 p.m., Greco, while at the Ridgley Inn, drank 'a few beers' and smoked marijuana. Additionally, he 'got some' caffeine pills. He then went to a party at the 'Storeroom Bar' where he stayed until about 2 a.m. While at the party, Greco says he drank 'about ten drinks-Jack Daniels and Coke and Molson's Ale.' He also 'had some marijuana cigarettes.' When Greco left the party, he 'took a six-pack of Michelob with' him.

While driving on Charles Street toward the City of Baltimore, Greco 'remembered the conversation with Mrs. Larsen.' Because he knew she stayed up late at night watching television, he decided to stop off to see her.

At Larsen's home, Greco testified, he and Larsen had a lengthy conversation about his relationship with Sheryl as

---

while this appeal was pending, or whether the new sentences imposed were legal, and we set forth no opinion on those matters. The sentence that Greco was serving prior to the circuit court's orders granting post-conviction relief under § 7–106(c) remains in effect. Any arguments that Greco may have against the legality of that sentence have not been presented to this Court, and we do not address them.

well as his use of alcohol and marijuana. Larsen and Greco allegedly began to aggravate each other. Larsen, according to Greco, 'started talking about sex.' She then went to fix coffee. Greco reportedly went to the bathroom and when he returned, Larsen, allegedly with the top of her pajamas unbuttoned, approached him while he was drinking coffee and requested that they have sexual intercourse. Greco told the jury that he and Larsen engaged in copulation on the kitchen floor. Upon the completion of the coupling, Greco 'dozed off.' Suddenly he was awakened by a feeling of pain in his chest. He observed Larsen standing over him with a knife in her hand.

A struggle ensued as Greco wrestled with Larsen to obtain the knife. During that struggle Larsen cut her hand and Greco is said to have fainted from the sight of blood. He regained consciousness when Larsen allegedly stabbed him in the side. He in turn grabbed her around the neck. They then stumbled into the living room and fell upon the sofa. Fearing that Larsen would kill him, Greco put a pillow over Larsen's face 'because she looked so bad.' He found later that she had ceased breathing.

Greco testified that while he was in a state of panic and frenzy, he rinsed the blood from the knife, washed his face and hands, cleansed his wounds as well as Larsen's, notwithstanding that she was obviously dead, bandaged Larsen's wounds, and then covered her with an afghan.

Ten year old Mary Lee Derrickson and eleven year old Joelle Myers, respectively granddaughter and great granddaughter of Larsen, were staying in the house that night with Larsen. Greco, realizing that they were there, awakened them from their supposed sleep and informed them that they were leaving the house with him.

The trio journeyed to College Park, Maryland, in order to find Sheryl Fitch. Greco told Sheryl what had happened. He asserted that Larsen had seduced him and then tried to stab him. He sustained several minor wounds. Sheryl returned to Baltimore with the trio and after dropping the two children at their parents' home, Greco and Sheryl

proceeded to Larsen's house where Sheryl discovered that the police had arrived. Greco drove to his parents' house where he was subsequently arrested."

In a jury trial in the Circuit Court for Baltimore County, Vincent Greco, Jr., testified in his own defense that he and Mrs. Larsen had consensual intercourse on the night of her death, and that, when he killed her, he believed that his actions were necessary to save his life. To corroborate his testimony, Greco sought to introduce the expert testimony of Dr. Leonard Rothstein, a defense psychiatrist who had examined Greco. Dr. Rothstein offered to testify, in relevant part, that Greco's psychiatric makeup included a specific phobia regarding physical assaults and the sight of blood which caused him to misperceive the threat that the 78–year–old victim posed towards him when she allegedly stabbed him on the night he killed her.

The trial court admitted some, but not all, of Dr. Rothstein's proffered testimony. The trial court noted that, under *Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982), testimony offered in support of a diminished capacity defense was not admissible, and further explained its ruling, in part, as follows:

"Now, I would follow the opinion in *Waine v. State*, 37 Md.App. [222] at 243 [377 A.2d 509 (1977) ] ... [that] 'permitted [the defense psychiatrist] to testify in a limited fashion, and that would be that he could testify with regard to what he thinks the psychiatric makeup of the person is.... He cannot testify with regard to any conclusion that he has reached with regard to whether or not this person might possibly be able to commit an act of violence or did in fact commit [the act].... We can find no abuse of discretion on the part of the trial judge when he allowed testimony concerning the psychological makeup of the appellant but not an ultimate conclusion, which the doctor admitted he was not competent to make.' Well, basically, as I stated yesterday, certain ultimate conclusions I have prohibited and I think that *Waine* and other cases ... would support that view. That's my opinion."

The trial court did not permit Dr. Rothstein to testify that Greco had misperceived the threat as a result of his specific phobia on the grounds that the testimony was offered in support of a diminished capacity defense, which was disallowed in *Johnson,* 292 Md. 405, 439 A.2d 542. Dr. Rothstein was allowed, however, to testify that, among other things, Greco's psychiatric makeup included this specific phobia. After extensive bench conferences regarding the purpose of the proposed testimony, defense counsel asked Dr. Rothstein a hypothetical question as to how a person with Greco's phobia might react to a scenario that matched Greco's description of the night's events. The exchange occurred as follows:

[Defense Counsel]: ... I would like you to add a couple of facts to the hypothetical and ask your opinion based upon those facts. Assume the fact ... that the defendant was awakened in pain, there was a struggle with another person, that he then saw blood. I would like you to add in there upon seeing blood he fainted, that he awoke a second time, saw the same blood a second time, saw this person with whom he struggled have a knife in his possession. Would in your opinion the defendant's act of perhaps strangling this woman be consistent with a phobic response?

[Dr. Rothstein]: You would like me now to answer that?

[Defense Counsel]: Please.

[Dr. Rothstein]: My answer would be yes, it is consistent with some of the features of the operation of a phobic reaction.

[Defense Counsel]: Could you explain what you mean by that?

[Dr. Rothstein]: Yes. The feature that is most directly a product of the phobic response would in that situation be the fainting upon being presented with the stimulus, the combined stimuli of the sight of blood and the perception that someone was attacking him. That would be perceived as a threat.

[Prosecutor]: Objection.

[The Court]: I'm not sure—overruled, overruled.

[Dr. Rothstein]: (continuing) That would be perceived as a threat of bodily harm. The second way in which it would be consistent would be that in the case of somebody who faints as a result of a phobic response to a specific stimulus or indeed anyone who experiences a fainting episode, that there is a brief period following the recovery from the fainting episode during which there is some residual confusion and unclarity of thinking. And that particular state of mind would contribute to the possibility of a misappraisal or misevaluation of what was being seen. That coupled with the fact that the person's particular emotional response to the threat of bodily harm would tend to result in the combination of the misperception and the overreaction to that which was misperceived.

On April 6, 1982, Greco was convicted of first degree murder, felony murder, and first degree rape. On May 14, 1982, the circuit court imposed consecutive terms of life imprisonment for the first degree murder and first degree rape convictions, as well as a concurrent life sentence for the felony murder conviction.

Greco noted a direct appeal, and on June 28, 1983, this Court affirmed Greco's convictions but remanded the case for resentencing. We held that Greco's two separate terms of life imprisonment for felony murder and first degree murder of the same victim were inappropriate as it is "manifestly impossible to kill the same person twice." On January 30, 1984, the circuit court resentenced Greco to consecutive terms of life imprisonment for the first degree murder and first degree rape convictions, and the circuit court did not give Greco a sentence for his felony murder conviction to avoid sentencing him twice for a single homicide.

On February 3, 1984, Greco filed his first motion for reduction of sentence which the circuit court held *sub curia* until July 16, 1992 when the circuit court reduced Greco's sentence to run the life sentences concurrently. On August 17, 1992, Greco filed his second motion for a reduction of sentence, which the circuit court denied as untimely filed under Mary-

land Rule 4–345. The Court of Appeals reversed the denial of the second motion for a reduction of sentence on October 16, 1997, holding that the circuit court had misinterpreted the timeliness requirement in the rule. *Greco v. State,* 347 Md. 423, 431–32, 701 A.2d 419, 423 (1997). On July 9, 1998, the circuit court reduced Greco's concurrent life sentences to life imprisonment, with all but fifty years suspended in each sentence.

On September 24, 1998, Greco filed an application for review of sentence. On January 17, 2002, a three-judge panel declined to reduce Greco's sentence. Greco filed a third motion for modification of sentence on October 7, 1998. On July 28, 2006, the circuit court denied that motion.

On December 2, 1996, Greco filed a petition for post-conviction relief, which he amended on June 18, 2008 to include his claim that he was entitled to a new trial at which more of Dr. Rothstein's proffered testimony would be allowed. On September 24, 2009, the circuit court granted Greco's petition for post-conviction relief, reasoning that § 7–106(c) [4] allowed a new trial based on the theory that *Hoey v. State,* 311 Md. 473, 536 A.2d 622 (1988), and *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), together overruled the rule from *Johnson,* 292 Md. 405, 439 A.2d 542, that had been applied in Greco's trial to exclude some of Dr. Rothstein's testimony.

---

**4.** § 7–106(c) of the Criminal Procedure Article reads as follows:

"(c) *Effect of judicial decision that Constitution imposes new standard.—*

(1) This subsection applies after a decision on the merits of an allegation of error or after a proceeding in which an allegation of error may have been waived.

(2) Notwithstanding any other provision of this title, an allegation of error may not be considered to have been finally litigated or waived under this title if a court whose decisions are binding on the lower courts of the State holds that:

(i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard not previously recognized; and

(ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence."

On October 23, 2009, the State filed, in this Court, an application for leave to appeal the post-conviction relief granted to Greco and, in the circuit court, a motion to reconsider the post-conviction relief. On February 25, 2010, the post-conviction court issued an order that "concern[ed] clarification with regard to the Court's [September 24, 2009] ordering a new trial" and specified that the grant of a new trial applied only to Greco's conviction for first degree murder and not to the convictions of first degree rape and felony murder. On April 23, 2010, this Court granted the State's application for leave to appeal.

## II.

Before this Court, the State argues that the circuit court erred in granting Greco's petition for post-conviction relief because the issue of the admissibility of Dr. Rothstein's testimony had been fully litigated in Greco's trial and direct appeal, and because Greco did not satisfy all of the requirements in § 7–106(c) to allow an exception to the prohibition against post-conviction appeals of fully litigated matters. The State argues that "[t]he circuit court erroneously determined that [the *Hoey* and *Simmons* ] opinions created a new legal standard" and erroneously determined that this standard was "required under federal or State Constitutional law and were intended to be applied retrospectively." Since each of these elements—a new legal standard, a constitutional mandate, and a retrospective intention—is required by § 7–106(c), the State contends that the circuit court erred in applying this statute to Greco's case where none of these elements are present. Furthermore, the State argues that Dr. Rothstein was allowed to present the testimony that Greco argues was excluded, that the trial court instructed the jury on the theory of imperfect self-defense, that Greco presented a closing argument based on this theory, implicitly referencing Dr. Rothstein's testimony, and that Greco, therefore, was not prejudiced by any application of the *Johnson* ruling that might conflict with *Hoey* and *Simmons*.

Greco argues first that this Court does not have jurisdiction to hear this appeal because the circuit court order was clarified with a subsequent order, Greco filed a motion to amend the subsequent order, and that his motion is pending, which, according to Greco, means there is no final order from which to appeal. Greco argues next that the State has waived the issue of the applicability of § 7–106(c) and the lack of prejudice at trial because the State did not make these arguments before the circuit court. Greco argues also that *Hoey* and *Simmons* announced a new rule, that the new rule was constitutionally mandated, and that the Court of Appeals intended the rule to be applied retrospectively. Finally, Greco argues that he was prejudiced when he was prohibited from presenting all of Dr. Rothstein's testimony or discussing his testimony in closing argument, and that this corroborating testimony would have enhanced his credibility and swayed the jury such that he should be given a new trial on all his convictions.

## III.

Before reaching the merits of the State's appeal, we must first address Greco's jurisdiction and waiver arguments. Greco's first argument against this Court's jurisdiction is, essentially, that the State appealed from the wrong order. The State appealed from the circuit court's order that granted Greco a new trial. Although the State asked the circuit court to reconsider this order for various reasons, the circuit court did not vacate or supercede its original order, but rather *clarified* in the subsequent February 25, 2010 order that the original order was meant to grant a new trial for the first degree murder conviction only, as this issue had not been specifically addressed in the original order.

We hold that the State appealed from the correct order, as it was the original order that granted the new trial, and Greco's argument is without merit. Likewise, Greco's argument that his motion to alter or amend the February 25, 2010 clarifying order denies this Court jurisdiction fails both be-

cause that motion has been denied by the circuit court and because it is not the clarification that is being appealed but the original order that granted a new trial.

Greco further argues that the State has waived the specific arguments that it makes on appeal as to why the circuit court erred in relying upon § 7–106(c) to grant a new trial based on retrospective application of *Hoey* and *Simmons* because the State did not make identical arguments to the circuit court. Although the State's advocacy of its position before the circuit court could have been more expansive, the record indicates that the State argued that the rule described in *Hoey* and *Simmons* should not be applied retrospectively, that the matter at issue had been finally litigated decades earlier, and that post-conviction relief was not warranted under § 7–106(c). The circuit court then ruled that the post-conviction relief of a new trial to retrospectively apply the rule in *Hoey* and *Simmons* was available to Greco, even though the matter had been finally litigated, because he met the criteria under § 7–106(c)(2).

■■■ Maryland Rule 8–131(a) states that appellate courts ordinarily decide only those issues "raised in or decided by" the lower court, and even if the State did not raise the § 7–106(c)(2) criteria issue below, the circuit court clearly decided that issue. Under these circumstances, it would appear absurd to prohibit the State from addressing on appeal the rationale for the circuit court's ruling more directly on the grounds that the State did not anticipate correctly that rationale prior to the circuit court's ruling. As the State aptly notes, the Court of Appeals has said that "an appellant/petitioner is entitled to present the appellate court with a more detailed version of the argument advanced" below. *See Starr v. State,* 405 Md. 293, 304, 951 A.2d 87, 93 (2008) (internal quotations omitted). The State, on appeal, has made a more detailed version of the argument it made below, i.e., that post-conviction relief was not warranted, and the circuit court clearly decided the issue the State addresses. The argument

in question has not been waived.[5]

Greco argues also that the State failed to preserve and therefore waived the argument that post-conviction relief is inappropriate because Greco was not prejudiced by any alleged errors at his trial. Because this appeal can be resolved completely by our ruling on the § 7–106(c)(2) issue, we need not reach the issue of prejudice at trial and therefore do not address it or the question of whether it is properly before this Court.

## IV.

■ The circuit court granted Greco a new trial under § 7–106(c)(2). This provision allows an otherwise finally litigated allegation of error to be deemed not finally litigated in order to allow for the retrospective application of new rulings under the following conditions:

"... if a court whose decisions are binding on the lower courts of the State holds that:

(i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard not previously recognized; and

(ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence."

---

5. In addition, this Court also has discretion under Rule 8–131(a) to a decide issues neither raised in nor decided by the circuit court "if necessary or desirable to guide" the lower court. *See Burden v. Burden,* 179 Md.App. 348, 355, 945 A.2d 656, 661 (2008) (deeming exercise of such discretion necessary when the issue and the "application of the analytical framework required to resolve it, are highly likely to recur"); *Hurt v. Chavis,* 128 Md.App. 626, 638, 739 A.2d 924, 930 (1999) (noting that such discretion extends even "to circumstances when the parties have not even raised the issue on appeal."). As there is a dearth of authority on applying § 7–106(c)(2), the circuit court here expressed a desire for appellate guidance (i.e., "I would like the Court of Special Appeals, very frankly, to tell me I was wrong."). We exercise this discretion to whatever extent necessary and decide this issue.

The plain meaning of this language indicates that the grant of a new trial for the retrospective application of a new ruling under § 7–106(c)(2) requires that *all* of the following six conditions must be met:

(a) a court of binding authority must make a ruling;

(b) the ruling must impose a procedural or substantive standard;

(c) the standard must be not previously recognized;

(d) the state or federal constitution must impose this standard;

(e) the court must intend for the standard to be applied retrospectively; and

(f) such a retrospective application must affect the validity of a conviction or sentence at issue.

To determine the applicability of § 7–106(c)(2) to this case, we begin our analysis with conditions (b), (c), and (d). We must answer three questions: Did a ruling impose a standard? Was that standard not previously recognized? And was the standard imposed by the Maryland or federal constitution? If we answer in the negative to any of these questions, § 7–106(c)(2) is not applicable and the circuit court's decision to grant him relief under this provision must be reversed.

Greco contends that, in *Hoey* and *Simmons,* the Court of Appeals held that the State and federal constitutions required that a defendant be allowed to present expert testimony regarding his mental impairment in support of a claim of imperfect self-defense, and that this standard was a departure from the rule set forth in *Johnson.* The State, on the other hand, asserts that even if these cases do set forth a new standard, nothing indicates that the new requirement is imposed by the federal or State constitution.

### A. The Standards

Both parties agree that, as set forth in *Hoey* and *Simmons,* Maryland law currently allows a defendant to present testimony regarding his mental impairment in support of a claim of imperfect self-defense. In order to analyze this

further, we will break this ruling down into its three constituent parts.

■■■ At the most fundamental level, this rule rests on the bedrock principles that the State must prove each element of a criminal charge in order to convict and that a defendant is entitled to present a defense to attempt to rebut each element of such a charge. At the secondary level of State criminal law, this rule relies upon a legal definition of murder that recognizes the affirmative defense of imperfect self-defense based upon an unreasonable subjective belief. At the final level, where the prior two levels are applied to the facts of a trial, this rule holds that psychological evidence of a defendant's mental impairment, including testimony from a psychiatric expert, may be relevant to proving such a defense and therefore may be admissible. We will analyze each level described above as a separate standard under § 7–106(c)(2).

### B. Not Previously Recognized?

Each of the three standards appears to have been recognized prior to the *Hoey* and *Simmons* decisions, and therefore § 7–106(c)(2) is inapplicable.

#### 1. *Right to Present a Defense as to Every Element Was Recognized Previously*

The fundamental standard regarding the State's need to prove every element of a crime and the defendant's right to present a defense was recognized long before *Hoey* and *Simmons,* and well before Greco's trial as well. Indeed, this standard was reiterated in *Johnson* when the Court of Appeals stated, "[c]ertainly, we recognize the basic proposition that the [S]tate must prove every element of a crime beyond a reasonable doubt, including specific intent if necessary, and that an accused is entitled to rebut the [S]tate's case." *Johnson*, 292 Md. at 425 n. 10, 439 A.2d at 554 (citing *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)).

### 2. *Unreasonable Belief Imperfect Self–Defense Was Recognized Previously*

Imperfect self-defense, as a defense, was recognized prior to *Hoey* and *Simmons,* but was still somewhat in flux in 1982, the year of both *Johnson* and Greco's trial. As the Court of Appeals noted in *Simmons,* "[t]he defense of imperfect self-defense was first recognized by this Court in *State v. Faulkner*" in 1984. *See Simmons,* 313 Md. at 39, 542 A.2d at 1261. In *State v. Faulkner,* 301 Md. 482, 495–501, 483 A.2d 759, 766–69 (1984), however, the Court of Appeals discussed several cases from as early as 1975 in which the Court of Special Appeals had recognized various forms of imperfect self-defense, including a version of the unreasonable subjective belief form of the defense. *See also Shuck v. State,* 29 Md.App. 33, 349 A.2d 378 (1975); *Wentworth v. State,* 29 Md.App. 110, 349 A.2d 421 (1975); *Law v. State,* 29 Md.App. 457, 349 A.2d 295 (1975). The status of this defense as a matter of Maryland law in 1982 was that it had been recognized by the Court of Special Appeals, but the details of it had not yet been fully delineated and settled by the Court of Appeals.

### 3. *Admissibility of Mental Impairment Evidence Was Recognized Previously*

■ Whether the final standard, on the admissibility of psychological evidence, qualifies as being not recognized previously depends on how one interprets the holding of the Court of Appeals in *Johnson.* In that case, the trial court allowed only some of the expert psychiatrist's report offered by the defense for the purpose of mitigating first degree murder and any specific intent crimes, essentially limiting the report to its discussion of the defendant's below-average intelligence. *See Johnson,* 292 Md. at 417–18, 439 A.2d at 550. The defendant appealed this limitation, asserting "that the entire report is relevant to his defense of 'diminished capacity'—that is, he did not have sufficient mental capacity to form the requisite specific intent to commit some of the crimes...." *Id.* The Court of Appeals held that because Maryland "does not recognize diminished capacity as a legal doctrine operating to

negate specific criminal intent, it was not error to exclude evidence in support of it." *Id.* at 418, 439 A.2d at 550. Because the specific ruling that Maryland does not recognize the diminished capacity defense was sufficient to resolve the evidentiary question presented in *Johnson,* the remainder of the opinion's discussion of the topic can be regarded properly as dicta. The Court's dicta in this section of *Johnson* expounded in somewhat sweeping terms on the history and rationale behind Maryland's rejection of the diminished capacity defense, on its relationship to the plea of not criminally responsible, and on the acceptable use of diminished capacity as mitigation during sentencing. *Id.* at 418–29, 439 A.2d at 550–56. As will be discussed in more detail below, this sweeping dicta contained the language (e.g., that "all legally sane individuals are equally capable of forming and possessing the same types and degrees of intent," *id.* at 420, 439 A.2d at 551) that was later misinterpreted as having created a rule even though, as dicta, it provided no binding authority. To the extent that the holding in *Johnson* is interpreted as being limited to the rejection of the diminished capacity defense, it is unproblematic because the Court of Appeals has held consistently, and continues to hold, that the diminished capacity defense is not available in Maryland. *See, e.g., Fisher and Utley v. State,* 367 Md. 218, 267, 786 A.2d 706, 735 (2001); *Hoey,* 311 Md. at 495 n. 5, 536 A.2d at 632. Yet the *Johnson* holding has not always been interpreted so narrowly.

Greco urges this Court to give an unnecessarily broad reading to the holding in *Johnson.* In his brief, Greco characterizes the *Johnson* opinion as holding that a sane criminal defendant is not entitled to present expert psychiatric testimony for the purpose of negating the elements of first degree murder. This characterization of the *Johnson* opinion fails to appreciate the distinction between the diminished capacity defense that a defendant is mentally incapable or less capable of forming a specific intent and the defense that one simply did not possess a specific intent. Although there are obvious and substantial areas of overlap between the evidence that one might offer to support these two defenses, there is nothing

inconsistent in ruling such evidence both admissible when offered for the later defense and inadmissible when offered for the former because the former defense is not recognized in Maryland. Finding evidence inadmissible when offered for a diminished capacity defense does not imply necessarily that the same evidence would be inadmissible to show a lack of specific intent. The *Johnson* opinion made no such holding regarding the lack of specific intent defense, but rather took pains to stress the distinction between "evidence demonstrating that the defendant did not *as a fact* possess the requisite mental state" and "evidence establishing that the defendant was *generally less capable* than a normal person of forming a requisite *mens rea.*" *Johnson*, 292 Md. at 425 n. 10, 439 A.2d at 554 (noting that "we cannot agree with those courts which easily declare that evidence of a legally sane defendant's mental impairment is always probative on the factual question of whether a particular accused entertained the requisite mental state."). By stating that such psychological evidence was *not always* admissible, the *Johnson* Court implied that, nevertheless, sometimes such evidence was admissible.

Six years later in *Hoey* and *Simmons,* the Court of Appeals interpreted the holding in *Johnson* in the manner that Greco urges and purported to disapprove or modify the portion of the opinion that Greco finds objectionable. Focusing on certain sweeping language in the *Johnson* dicta (i.e., that "all legally sane individuals are equally capable of forming and possessing the same types and degrees of intent," *id.* at 420, 439 A.2d at 551), the Court in *Hoey* reasoned that the "legal implication of this holding was that nothing short of insanity could rebut a mental element of a crime." *Hoey,* 311 Md. at 494–95, 536 A.2d at 632. The Court reaffirmed the holding of *Johnson,* rejecting the diminished capacity defense, but disapproved of "that portion of the *Johnson* opinion which indicated that a criminal defendant is not entitled to present evidence of his impaired mental condition for the limited purpose of showing the absence of *mens rea,*" without pointing out what portion of the opinion might actually do such a thing. *Id.* at 495 n. 5, 536 A.2d 622, 536 A.2d at 632. Months later, in a

footnote similarly devoid of analysis, the Court in *Simmons* declared that *Hoey* had "modified *Johnson* to allow a criminal defendant to present evidence of his impaired mental condition for the limited purpose of showing the absence of *mens rea.*" *Simmons,* 313 Md. at 39 n. 3, 542 A.2d at 1261.

These snippets of language from *Hoey* and *Simmons* suggest that, as a result of *Johnson,* for the period between 1982 and 1988, Maryland did not allow defendants to present *any* expert psychiatric testimony to support a lack of *mens rea.* A closer examination of the *Simmons* opinion, however, reveals that this suggestion is incorrect. The *Simmons* Court held not that all testimony offered for this purpose was admissible, but that a trial court could not summarily reject all such testimony offered for this purpose as a matter of law. *See Simmons,* 313 Md. at 47–48, 542 A.2d at 1265. One proper limitation to such testimony is that a psychiatrist may be restricted from testifying as to what the defendant was actually thinking or believing, on the grounds that "a psychiatrist cannot precisely reconstruct the emotions of a person at a specific time." *Id.* The Court explained that for this reason Maryland courts had held admissible "psychiatric testimony when it is limited to discussion of the psychological profile of the defendant." *Id.* at 46, 542 A.2d at 1264. Two of the cases that the *Simmons* Court used to explain and support this distinction come from within the 1982–1988 time period at issue, and both aptly demonstrate that Maryland courts allowed expert psychological testimony regarding mental impairments, within limits, for the purpose of showing a lack of *mens rea.* *See id.* at 43–46, 542 A.2d at 1263–64.

The Court in *Simmons* described a 1983 Court of Special Appeals case where the defendant claimed his participation in two murders was coerced, and although the trial court refused to allow the psychiatrist to testify that the defendant did not (or could not) participate voluntarily in the violence, this exclusion was not an abuse of discretion because "the psychiatrist had been permitted to opine that the defendant's psychological profile revealed that he was passive and easily led." *Id.* at 45, 542 A.2d at 1263–64 (discussing *Kanaras v. State,* 54

Md.App. 568, 588, 460 A.2d 61, 73 (1983)). The *Simmons* Court also discussed a 1985 Court of Appeals case where the defendant from the 1982 *Johnson* case appealed his conviction from a different murder, and although the trial court refused to allow an expert psychiatrist to testify that Johnson was definitely under the mental control of his accomplice, the Court affirmed this exclusion because the psychiatrist was "permitted to testify that Johnson had passively followed [the accomplice] in the past and was manipulated by [him] in many ways." *See id.* at 43–44, 542 A.2d at 1263 (discussing *Johnson v. State,* 303 Md. 487, 515, 495 A.2d 1, 15 (1985)).

The 1985 *Johnson* case (hereinafter, *"Johnson '85"*) is particularly instructive as to the interpretation given to the 1982 *Johnson* case because in the 1985 case Johnson appealed, among other things, both the trial court's summary exclusion of evidence offered in support of a diminished capacity defense and the trial court's partial exclusion of expert psychiatric testimony discussed above. *See Johnson '85,* 303 Md. at 501–02, 495 A.2d 1, 8. In *Johnson '85,* the Court of Appeals was asked to reconsider the 1982 *Johnson* holding, but the Court instead reaffirmed *Johnson* and held that the evidence offered to support a diminished capacity claim was excluded properly. *Id.* In the same opinion, the *Johnson '85* Court acknowledged that the trial court's decision to admit some, but not all, of the testimony of Johnson's expert psychiatrist was not an abuse of discretion. *Id.* at 515, 495 A.2d at 15. Thus, the Court of Appeals in 1985 saw no inconsistency in approving both the 1982 *Johnson* opinion and the admission of expert psychiatric testimony for purposes other than determining sanity.

For this reason, and those discussed above, Greco's description of the 1982 *Johnson* decision as "the Court of Appeals unequivocally [holding] that expert psychiatric testimony would be admissible in a criminal trial only where the defendant's sanity was at issue" is wrong.[6] Although the language

---

6. Indeed, the record of Greco's trial also belies his assertion, as Greco was allowed to offer some, but not all, of his expert psychiatric testimony even though it was not offered in support of an insanity plea.

discussed from *Hoey* and *Simmons* does seem to offer support for Greco's interpretation, our analysis of the *Johnson* opinion and its application to cases in the intervening years leads us to view the brief commentary on *Johnson* in *Hoey* and *Simmons* not as overruling a previous holding or imposing a new standard, but as clarifying a misunderstanding of the *Johnson* opinion. The 1982 *Johnson* opinion did not impose a standard contrary to the standard put forth later in *Hoey* and *Simmons* in 1988, nor did the Maryland courts appear to operate under a standard of admissibility significantly different in the years between these opinions.

We hold that the standard that evidence of a defendant's mental impairment, including expert psychiatric testimony, may be admissible for the purpose of supporting a lack of *mens rea* is not a new standard and should not be considered not recognized previously for the purpose of § 7–106(c)(2).

## C. Imposed by the Constitution of the United States or the Maryland Constitution?

Only the first of the three standards at issue, i.e., the right to present a defense to each element of a criminal charge, appears to be imposed by the United States Constitution or Maryland Constitution. Section 7–106(c)(2) is inapplicable.

### 1. *Right to Present a Defense as to Each Element Is Imposed by the United States and Maryland Constitutions*

The fundamental standard requiring the State to prove every element of the charged crime and allowing the defendant to present a defense is imposed by both the United

---

Although the Greco trial court was not always clear in its rulings or its rationales for said rulings, the record shows no summary exclusion of all psychiatric testimony based on *Johnson* as Greco asserts that *Johnson* required. Rather, the trial court's actual exclusions appear to conform fairly well with the measured limits discussed above and in *Simmons v. State,* 313 Md. 33, 43–48, 542 A.2d 1258, 1263–65 (1988), *Johnson v. State,* 303 Md. 487, 515, 495 A.2d 1, 15 (1985), and *Kanaras v. State,* 54 Md.App. 568, 588, 460 A.2d 61, 73 (1983).

States Constitution and the Maryland Constitution. These requirements have long been held to be basic elements of the due process of law guaranteed by the Fifth and Sixth Amendments to the United States Constitution and incorporated against the states through the Fourteenth Amendment. *See, e.g., Washington v. Texas*, 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967) (holding Sixth Amendment's guarantee of compulsory process for obtaining defense witness applies to state criminal proceedings). They are also equally guaranteed by the Maryland Declaration of Rights. *See, e.g., McCray v. State*, 305 Md. 126, 133, 501 A.2d 856, 860 (1985) (noting that "[t]he right of a defendant in a criminal trial to produce witnesses in his own behalf is a critical right, the implementation of which is guaranteed by Article 21, Maryland Declaration of Rights, and the Sixth Amendment to the United States Constitution."); *Johnson*, 292 Md. at 425 n. 10, 439 A.2d at 554 (noting that "we recognize the basic proposition that the [S]tate must prove every element of a crime beyond a reasonable doubt, including specific intent if necessary, and that an accused is entitled to rebut the [S]tate's case."). This standard, therefore, can be described properly as having been imposed by a constitution.

### 2. *Unreasonable Belief Imperfect Self–Defense Developed From the Common Law*

In *Faulkner*, where the Court of Appeals affirmed that the unreasonable belief variation of imperfect self-defense was a viable defense to a murder charge in Maryland, the origins, development and rationale for the defense were discussed in great detail and there was no indication that the Court considered any part of the defense to be required by either the State or federal constitution. *Faulkner*, 301 Md. at 486–501, 483 A.2d at 762–69. Rather, the Court engaged in classic common law reasoning, reviewed the logic of the various versions of imperfect self-defense advanced by different authorities, and concluded that "[o]ur review of the development of the imperfect defense doctrine and examination of the jurisdictions that have addressed circumstances when the

doctrine is applicable convinces us that the honest but unreasonable belief standard of imperfect self defense is the proper one to be followed in Maryland." *Id.* at 499–500, 483 A.2d at 768. Thus, this standard was not imposed by a constitution.

### 3. *Admissibility of Mental Impairment Evidence Not Imposed by a Constitution*

As discussed above, the standard regarding admissibility of mental impairment evidence in *Hoey* and *Simmons* is described more accurately as a clarification than a newly imposed standard, but to whatever extent it might be regarded as setting a new standard, it was not imposed by any principle or requirement contained in a constitution. The Court of Appeals described its holding on this issue in *Hoey* in the following manner:

> "[T]he *Johnson* opinion muddled the distinction between the concepts of criminal responsibility and *mens rea* .... We now make indelibly clear that, where a particular mental element of a crime must be proved to establish the commission of a crime, evidence that it did not exist, whether due to mental impairment or some other reason relevant to that issue, is admissible."

*Hoey*, 311 Md. at 495, 536 A.2d at 633. The Court deemed this clarification necessary to dispel a perceived confusion between the concepts of *mens rea* and criminal responsibility, but made no indication that this was the result of any constitutional mandate.[7]

In *Simmons*, the Court of Appeals merely applied the ruling in *Hoey* quoted above to a case where psychological

---

**7.** To be sure, both the federal constitution and the State constitution impose many standards that may involve the concept of *mens rea* or criminal responsibility, but nothing in the language of *Hoey v. State*, 311 Md. 473, 536 A.2d 622 (1988), indicates that the Court of Appeals found the admissibility of mental impairment evidence was required by these documents. Rather, the only discussion of constitutional law in this section of *Hoey* stated that the documents permitted the legislature to place the burden of proving a lack of criminal responsibility on the defendant because this did not relieve the State of its burden to prove *mens rea*. *Id.* at 495, 536 A.2d at 633.

evidence was offered to bolster a defense of imperfect self-defense but where the trial court had summarily excluded all such testimony. *Simmons*, 313 Md. at 39–41, 542 A.2d at 1261.

> "In light of *Hoey v. State*, Simmons is permitted to present evidence of his mental state in support of his defense of imperfect self defense .... [and because] of defense counsel's proffer that the expert would only testify that such a subjective belief would be consistent with Simmons's psychological profile we find the trial judge's ruling [that excluded all of the expert testimony] too broad."

*Id.* at 39 n. 3, 40–41, 542 A.2d at 1261. The Court did not rule that the trial court had violated a constitutionally protected right of Simmons or that a mandate from such a text required the conclusion; rather, the Court reviewed the previously established "principles relating to the admission of expert testimony," discussed the broad discretion a trial court is given on these questions, and concluded that the trial court erred by failing to recognize (and utilize) its own discretion. *See id.* at 41–48, 542 A.2d at 1261–65. These evidentiary principles and policies of judicial discretion were the authorities that imposed whatever standard might have been set forth in *Simmons*. There is no indication that it was imposed by a constitution.

### D. Do Any of the Standards Meet All the Requirements Under § 7–106(c)(2)?

We have established that only one of the standards at issue is imposed by a constitution, and that none of them are, in fact, not recognized previously. Because both of these conditions are required by the language of § 7–106(c)(2)(i), none of the standards are eligible for retrospective application to a criminal trial under § 7–106(c)(2). We hold that the circuit court that granted Greco a new trial under this statute did so in error.

In the alternative, even if we were to assume that the evidentiary standards set forth in *Hoey* and *Simmons* were not recognized previously, they would not be eligible for

retrospective application under § 7–106(c)(2) because they are not imposed by the Constitution of the United States or the Maryland Constitution. Greco argues that these rulings on admissibility should be deemed imposed by the constitutions because they affect the integrity of the fact-finding process, a defendant's right to put on a defense, and fundamental issues of guilt or innocence. This argument proves far too much. This reasoning would essentially consider any ruling on a matter that altered the admissibility of evidence at trial into one imposed by a constitution even if the holding at issue expressly limited its analysis to the common law or the rules of evidence. The fundamental principles embodied in our constitutions permeate and inform much of the reasoning and motivation behind our statutes, regulations, rules and case law, but this cannot be considered enough to make decisions based on these lesser authorities regarded as imposed by the constitutions that enshrine the rights that the lesser authorities seek to protect. Such an interpretation would effectively read the constitutional imposition requirement out of § 7–106(c)(2).

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.*