48 A.3d 816

**Vincent T. GRECO, Jr.**

v.

**STATE of Maryland.**

**No. 86, Sept. Term, 2011.**

Court of Appeals of Maryland.

June 26, 2012.

Reconsideration Denied Aug. 16, 2012.

Andrew T. Boone (Jon R. Fetterolf of Williams & Connolly, Washington, D.C.; Howard Cardin of Cardin & Gitomer, Baltimore, MD), on brief, for petitioner/cross-respondent.

Jeremy M. McCoy, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

BARBERA, J.

This matter stems from an order of the Circuit Court for Baltimore County granting Petitioner, Vincent T. Greco, Jr., postconviction relief by vacating his 1982 conviction for first degree premeditated murder and, as we shall see, leaving in place Petitioner's related convictions for felony murder and first degree rape. The Court of Special Appeals reversed that order and reinstated Petitioner's conviction for first degree premeditated murder. *State v. Greco,* 199 Md.App. 646, 24 A.3d 135 (2011). Petitioner filed a petition for writ of certiorari raising several issues and the State filed a conditional cross-

petition. We granted both the petition and conditional cross-petition. *Greco v. State,* 423 Md. 450, 31 A.3d 919 (2011). The questions before us, consolidated and rephrased,[1] are: (1) Whether the Court of Special Appeals properly exercised jurisdiction when it decided the State's appeal; (2) whether Petitioner is entitled to postconviction relief because this Court's decisions in *Hoey v. State,* 311 Md. 473, 536 A.2d 622 (1988), and *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), established a new, constitutionally-based rule that was intended to apply retroactively; and (3) whether the sentences are illegal.

For the reasons that follow, we hold that the Court of Special Appeals had jurisdiction to entertain the State's appeal, Petitioner was not entitled to postconviction relief, and the term-of-years sentence he received for first degree premeditated murder, but not the sentence for first degree rape, was illegal and must be corrected on remand.

---

1.  Petitioner presented the following questions for review:

    1.  May the Court of Special Appeals exercise jurisdiction over an appeal taken from a superseded Circuit Court order?
    2.  Did the Court of Special Appeals err when it concluded that this Court did not set forth a new, constitutionally-mandated rule when, in 1988, it overruled *Johnson v. State* and thereby permitted criminal defendants to present evidence of mental impairments in defense of specific intent crimes?
    3.  Did the Court of Special Appeals err when it declined to apply this Court's mandatory retroactivity standard to a rule that corrected an unconstitutional infringement on the factfinding process of criminal trials?
    4.  May a fifty-year term of years be imposed as punishment for first-degree murder or first-degree rape?

    The State presented these questions in its conditional cross-petition:

    [1]. Even if Greco had successfully demonstrated that this Court had established a new procedural standard that was constitutionally mandated in its holding in *Hoey v. State,* 311 Md. 473, 536 A.2d 622 (1988), and *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), did Greco nevertheless fail to establish that the standard was intended to be applied retrospectively, thereby disqualifying him from post-conviction relief under Section 7–106(c) of the Criminal Procedure Article?

    [2]. Was Greco's unrelated challenge to his resentencing not properly before the intermediate appellate court or this Court?

I.

## Background

In 1982, Petitioner was convicted by a jury in the Circuit Court for Baltimore County of first degree premeditated murder, first degree rape, and first degree felony murder. We adopt the summary of the facts of the crimes, which the Court of Special Appeals set forth in its opinion in the matter now before us. *Greco*, 199 Md.App. at 650–52, 24 A.3d at 137–38.

> Greco was tried for killing 78 year old Leta Jeanette Larsen who he allegedly beat brutally before he strangled and raped her in her living room on April 17, 1981.
>
> On the eve of Larsen's death, Greco, who had steadily dated Larsen's granddaughter, Sheryl Fitch, received a call from Larsen. She allegedly told Greco that she did not want him to continue to date her granddaughter. Larsen expressed concern over Greco's use of drugs and alcohol. That night, at approximately 9 p.m., Greco, while at the Ridgley Inn, drank "a few beers" and smoked marijuana. Additionally, he "got some" caffeine pills. He then went to a party at the "Storeroom Bar" where he stayed until about 2 a.m. While at the party, Greco says he drank "about ten drinks—Jack Daniels and Coke and Molson's Ale." He also "had some marijuana cigarettes." When Greco left the party, he "took a six-pack of Michelob with" him.
>
> While driving on Charles Street toward the City of Baltimore, Greco "remembered the conversation with Mrs. Larsen." Because he knew she stayed up late at night watching television, he decided to stop off to see her.
>
> At Larsen's home, Greco testified, he and Larsen had a lengthy conversation about his relationship with Sheryl as well as his use of alcohol and marijuana. Larsen and Greco allegedly began to aggravate each other. Larsen, according to Greco, "started talking about sex." She then went to fix coffee. Greco reportedly went to the bathroom and when he returned, Larsen, allegedly with the top of her pajamas unbuttoned, approached him while he was drinking coffee

and requested that they have sexual intercourse. Greco told the jury that he and Larsen engaged in copulation on the kitchen floor. Upon the completion of the coupling, Greco "dozed off." Suddenly, he was awakened by a feeling of pain in his chest. He observed Larsen standing over him with a knife in her hand.

A struggle ensued as Greco wrestled with Larsen to obtain the knife. During that struggle Larsen cut her hand and Greco is said to have fainted from the sight of blood. He regained consciousness when Larsen allegedly stabbed him in the side. He in turn grabbed her around the neck. They then stumbled into the living room and fell upon the sofa. Fearing that Larsen would kill him, Greco put a pillow over Larsen's face "because she looked so bad." He found later that she had ceased breathing.

Greco testified that while he was in a state of panic and frenzy, he rinsed the blood from the knife, washed his face and hands, cleansed his wounds as well as Larsen's, notwithstanding that she was obviously dead, bandaged Larsen's wounds, and then covered her with an afghan.

Ten year old Mary Lee Derrickson and eleven year old Joelle Myers, respectively granddaughter and great granddaughter of Larsen, were staying in the house that night with Larsen. Greco, realizing that they were there, awakened them from their supposed sleep and informed them that they were leaving the house with him.

The trio journeyed to College Park, Maryland, in order to find Sheryl Fitch. Greco told Sheryl what had happened. He asserted that Larsen had seduced him and then tried to stab him. He sustained several minor wounds. Sheryl returned to Baltimore with the trio and after dropping the two children at their parents' home, Greco and Sheryl proceeded to Larsen's house where Sheryl discovered that the police had arrived. Greco drove to his parents' house where he was subsequently arrested.

██ Petitioner's defense to the charges was that he acted in self-defense and, because he suffered from a blood phobia,

misperceived the threat Ms. Larsen posed and overreacted in response. Petitioner called an expert witness, Dr. Leonard Rothstein, in support of his theory of imperfect self-defense.[2] Petitioner sought to examine Dr. Rothstein regarding Petitioner's phobia as well as the psychiatric effects of both Petitioner's specific phobia and alcohol consumption. Petitioner asserted that such evidence was "admissible to assist the jury in understanding what the effects of alcohol and what the effects of the phobia might have had on Mr. Greco's perception[,] which lends to credibility." Petitioner also sought to demonstrate "how the phobia and other factors affected his mental state at the time and caused him to act and how it is believable and credible that he perceived that he was acting in the manner he says he was."

The trial court ruled that, "[w]ith respect to the proposed expert testimony concerning the mental state of the defendant, that testimony will not be admitted to support the fact that the defendant honestly but unreasonably believed that he was in danger of injury or that the killing was the only way to prevent it." The court explained that its ruling was based on the court's understanding that Petitioner's defense theory was the equivalent of the impermissible defense of diminished capacity. The court added, though, that its "ruling [would] not preclude evidence of intoxication and its effects to negate specific intent." After further discussion about the permitted scope of Dr. Rothstein's testimony, the court clarified its ruling:

> [E]xpert testimony from Doctor Rothstein that one: the phobia was combined with alcohol and drug consumption altered the defendant's judgment and impaired the accuracy of his perception causing him to improperly assess the

---

**2.** Imperfect self-defense "requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so. If established, the killer remains culpable and his actions are excused only to the extent that mitigation is invoked." *Christian v. State*, 405 Md. 306, 324, 951 A.2d 832, 842–43 (2008) (quotation omitted).

seriousness of the victim's alleged attack and to overreact to the alleged bodily injury, that is specifically excluded. And two, that the defendant did not as a fact premeditate or deliberate, but believed himself to be acting in self-defense, that is still part of what I call the diminished capacity imperfect self-defense defense. It would be excluded.

During trial, Dr. Rothstein testified that, "within reasonable medical certainty," Petitioner was likely to have a "phobic response" under the circumstances in which Petitioner "was awakened to a sensation of pain and a struggle ensued with another individual during which [Petitioner] saw blood." Dr. Rothstein gave testimony on the subject, in response to several other hypothetical questions posed by defense counsel as well as the State.

The jury convicted Petitioner of first degree premeditated murder, felony murder, and first degree rape. The trial court sentenced Petitioner to consecutive life sentences for premeditated murder and first degree rape, with a concurrent life sentence for felony murder.

On direct appeal, Petitioner argued, in part, that the trial court erred in excluding expert testimony that his "phobia of harm to his body and fainting at the sight of blood," together with his consumption of alcohol, "caused him to misperceive and improperly assess the seriousness of the victim's attack, to overreact to his perception of the threat of bodily harm, and negated an intent to kill or inflict great bodily harm on the deceased." With regard to that claim of error, the Court of Special Appeals, in an unreported opinion, held:

What [Petitioner] sought to do, notwithstanding a specific disavowal of the same, was to invoke the defense of diminished capacity, a defense, we note, that was rejected in *Johnson v. State*, 292 Md. 405 [439 A.2d 542] (1982). Irrespective of how [Petitioner] chooses to style his efforts, the result is the same, *i.e.*, the injection into the case of the diminished capacity defense. The Court of Appeals, as we have said, rejected that defense in *Johnson*. Likewise, we also reject that defense here.

The Court of Special Appeals affirmed all three judgments of conviction and vacated the sentences for premeditated and felony murder because separate sentences for two convictions of murdering a single individual could not stand. The life sentence for rape was not disturbed.

The Circuit Court, on remand, re-sentenced Petitioner to consecutive sentences of life imprisonment for premeditated murder and first degree rape, with no separate sentence for the felony murder conviction. Petitioner thereafter filed several motions to reconsider the sentences, pursuant to which the Circuit Court ultimately, in 1998, reduced the consecutive sentences for premeditated murder and rape to concurrent terms of life imprisonment, with all but fifty years suspended, and no term of probation following the unsuspended portion.

In December 1996, Petitioner filed a petition for postconviction relief. The petition remained pending and, in June 2008, Petitioner amended it to assert, *inter alia*, that the trial court's exclusion of Dr. Rothstein's testimony regarding Petitioner's psychiatric background impeded his ability to establish imperfect self-defense.

On September 24, 2009, the postconviction court issued a written opinion granting Petitioner relief in the form of a new trial. The court reasoned that § 7–106(c)[3] of the Uniform

---

3. Section 7–106(c) of the Uniform Postconviction Procedure Act (UPPA), "Effect of a judicial decision that Constitution imposes new standard," states:

(1) This subsection applies after a decision on the merits of an allegation of error or after a proceeding in which an allegation of error may have been waived.

(2) Notwithstanding any other provision of this title, an allegation of error may not be considered to have been finally litigated or waived under this title if a court whose decisions are binding on the lower courts of the State holds that:

(i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard not previously recognized; and

(ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence.

Postconviction Procedure Act (UPPA),[4] codified at Maryland Code (2001, 2008 Repl.Vol.), §§ 7–101 to 7–301 of the Criminal Procedure Article (CP), entitled Petitioner to a new trial. The court granted Petitioner a new trial based on the theory that *Hoey v. State*, 311 Md. 473, 536 A.2d 622 (1988), and *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988), together overruled *Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982), which the trial court had interpreted as barring some of Dr. Rothstein's testimony on Petitioner's defense of imperfect self-defense. The postconviction court reasoned that *Hoey* and *Simmons* established a new constitutional standard that was intended to apply retroactively. The court's opinion and order granting Petitioner a new trial did not specify to which conviction or convictions the order applied.[5]

The State applied for leave to appeal the September 24, 2009 postconviction order. That same day, the State filed a motion asking the Circuit Court to reconsider and clarify that its ruling applied only to the premeditated murder conviction. The Circuit Court issued a subsequent ruling dated February 25, 2010 confirming that postconviction relief was limited to a new trial solely on the premeditated murder charge. The State did not apply for leave to appeal the February 25, 2010 order.

The Court of Special Appeals granted the State's application for leave to appeal the September 24, 2009 order and thereafter issued its reported opinion, *Greco, supra,* reversing the grant of postconviction relief. The Court first addressed Petitioner's contention that the Court did not have jurisdiction to entertain the appeal because the State had not applied for leave to appeal the postconviction court's February 25, 2010 order. The Court rejected the contention, reasoning that the postconviction court's subsequent order "did not vacate or supercede its original [September 24, 2009] order, but rather

---

4. Unless otherwise noted, all statutory references herein are to the Uniform Postconviction Procedure Act.

5. That order also denied as moot Petitioner's pending motion to correct illegal sentence.

*clarified* in the subsequent February 25, 2010 order that the original order was meant to grant a new trial for the first degree murder conviction only, as this issue had not been specifically addressed in the original order." *Greco,* 199 Md. App. at 657, 24 A.3d at 141.

On the merits of the State's appeal, the Court of Special Appeals held that the postconviction court erred in granting Petitioner a new trial on the premeditated murder count. *Id.* at 671, 24 A.3d at 149. The intermediate appellate court separated the rule of law set forth in *Hoey* and *Simmons* into three components: (1) the right to present a defense to every element of a crime; (2) unreasonable belief imperfect self-defense; and (3) admissibility of mental impairment evidence. *Id.* at 661, 24 A.3d at 143. The court then held that each of those components had been recognized before *Hoey* and *Simmons* were decided. *Id.* at 667, 24 A.3d at 147. The intermediate appellate court also held that only the first of the three components "appears to be imposed by the United States Constitution or Maryland Constitution." *Id.* at 667, 24 A.3d at 147. Therefore, because the rule of *Hoey* and *Simmons* had to be both new and imposed by a constitution to be eligible for postconviction relief, Petitioner was not entitled to a new trial. We issued the writ to decide, *inter alia,* whether the Court of Special Appeals correctly reversed the grant of postconviction relief.

## II.

We address first the jurisdictional issue Petitioner has raised. Petitioner asserts, as he did before the Court of Special Appeals, that the intermediate appellate court lacked jurisdiction to consider the State's appeal "because the State did not appeal from the effective order providing ... relief." Petitioner repeats his contention that the Circuit Court's order dated September 24, 2009 vacated each of his convictions and granted him a new trial on all charges. According to Petitioner, the Circuit Court's subsequent order dated February 25, 2010 amended the prior order and limited relief to the first degree premeditated murder conviction only and,

because the State did not appeal the February 25 order, which "superseded" the prior postconviction order, the "issues arising from it are moot." The State counters that the Court of Special Appeals had jurisdiction because the State appealed the order granting relief with respect to the only applicable conviction, *i.e.*, first degree premeditated murder, and the subsequent order issued by the Circuit Court only clarified that the relief applied to that one conviction. We agree with the State.

The postconviction court issued its opinion and order on September 24, 2009 addressing Petitioner's claim for relief. The record of the postconviction proceedings reveals that Petitioner's sole basis for seeking relief related to the premeditated murder conviction. Both in the amended petition and in oral argument at the hearing before the postconviction court, Petitioner's claim focused exclusively on the failure of the trial court to allow him sufficient opportunity to establish imperfect self-defense. That defense was applicable only to the premeditated murder conviction, not to the felony murder and rape convictions. The limited focus of Petitioner's contention was evident to the postconviction court. The court noted specifically in the opinion accompanying the September 24, 2009 order that "[P]etitioner raises two issues for post conviction relief, both of which stem from the trial court's decision preventing the petitioner from presenting his theory of imperfect self-defense." That court, moreover, explicitly based its opinion and grant of relief "upon the [P]etitioner's attempt to introduce expert psychiatric testimony in order to support his claim of imperfect self-defense." Although the accompanying order simply granted postconviction relief and ordered a new trial, the rationale for the court's order, thoroughly explained in the court's opinion, demonstrates that the relief granted pertained solely to the premeditated murder conviction.

The February 25, 2010 order was issued pursuant to the State's request in its motion that the court reconsider the grant of relief or, at the least, clarify that the relief applied only "to premeditated first degree murder and not the two remaining counts of first degree felony murder and first

degree rape." At the hearing on the State's motion, the court denied reconsideration of the relief granted, but agreed with the State that the order needed to be clarified. The court ruled:

[I]t should have been clear—and perhaps it was not—that the Court felt that under the law the testimony of the psychiatrist in this case should have been allowed to present the imperfect self-defense theory, and that would have been used in an effort to show that the defendant in this case lacked the mental capacity to form the requisite intent to commit murder in the first degree, not as to the first degree rape and/or felony murder.

As such, the Court will amend this order that the motion for new trial is granted as to the first-degree premeditated murder only.

The court's February 25, 2010 order did not supersede the September 24, 2009 order, as Petitioner contends, but rather made clear the intended limited scope of the earlier order.

The State timely applied for, and ultimately was granted, leave to appeal the grant of postconviction relief of a new trial on the charge of premeditated murder. The Court of Special Appeals had jurisdiction to review that claim.

## III.

### A.

Petitioner contests the Court of Special Appeals's reversal of the postconviction court's order granting him a new trial on the premeditated murder charge. We have said that Petitioner sought to defend that charge by claiming imperfect self-defense, offering the theory that his blood phobia caused him to misperceive and overreact to the threat posed by the victim. In support of that theory, Petitioner attempted to offer the expert psychological testimony of Dr. Rothstein, but the Circuit Court, citing *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982), ruled that the proffered testimony was disallowed insofar as it sought to establish a defense of diminished

capacity. The Court of Special Appeals affirmed that ruling on direct appeal.

Petitioner does not deny that the UPPA generally bars relief on the basis of allegations of error that have been "finally litigated." *See* § 7–102(b) ("A person may begin a proceeding brought under this title if: (1) the person seeks to set aside or correct the judgment or sentence; and (2) the alleged error has not been previously and finally litigated . . ."). He also accepts, or at least does not contest, that the allegation of error he has brought in this postconviction proceeding was "finally litigated" on direct appeal of the judgments of conviction.

Petitioner argues nonetheless that the allegation of error was properly before the postconviction court. As he has done throughout these proceedings, Petitioner argues that the alleged error comes within the exception to the "finally litigated" bar that is set forth in § 7–106(c) of the UPPA. Once again, that subsection provides:

(1) This subsection applies after a decision on the merits of an allegation of error or after a proceeding in which an allegation of error may have been waived.

(2) Notwithstanding any other provision of this title, an allegation of error may not be considered to have been finally litigated or waived under this title if a court whose decisions are binding on the lower courts of the State holds that:

(i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or substantive standard not previously recognized; and

(ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence.

The parties agree that, as stated in *Hoey* and *Simmons,* Maryland law permits a criminal defendant to present testimony concerning his mental impairment to support a claim of imperfect self-defense. The parties also seem to agree that,

only if the legal standard set forth in *Hoey* and *Simmons* were both new and of constitutional dimension, as required by § 7–106(c)(2)(i), would it be necessary for us to determine whether the standard is "intended to be applied retrospectively," and would thereby affect the validity of Petitioner's conviction for first degree premeditated murder.

The parties disagree about whether in *Hoey* and *Simmons* we recognized a new legal standard required by a constitution. As we shall see, the rule of law set forth in those cases in fact *was* previously recognized by the law in this State and therefore was not "new," as that term is understood in the context of § 7–106(c)(2)(i). Consequently, we need not and do not address whether the rule is one of constitutional dimension.

### B.

Determining whether a principle of law qualifies as "not previously recognized" is a question best answered by examining the legal landscape before and after issuance of the decision setting forth the legal principle at issue. If a rule does not squarely amend a prior rule, but merely clarifies it or comments on dicta associated with it, then it will not qualify as "not previously recognized." *See Hunt v. State*, 345 Md. 122, 151–52, 691 A.2d 1255, 1269 (1997) (holding that *Wills v. State*, 329 Md. 370, 620 A.2d 295 (1993) did not "alter existing case law" relating to the reasonable doubt jury instruction, and that language in *Wills* relied upon by the petitioner as a new rule was not part of the holding in that case); *see also Davis v. State*, 285 Md. 19, 23–31, 400 A.2d 406, 408–12 (1979) (holding that *State v. Grady*, 276 Md. 178, 345 A.2d 436 (1975), did not alter the jury instruction rule attached to the alibi defense announced by *Floyd v. State*, 205 Md. 573, 109 A.2d 729 (1954), but only clarified a point of confusion generated by language in *Floyd* ).

Petitioner argues that *Hoey* and *Simmons* announced a new rule by overturning a conflicting rule set forth six years earlier, in *Johnson*. Specifically, Petitioner asserts that *Johnson* precluded his claim of imperfect self-defense by prohibit-

ing the admission of mental impairment evidence that disputed the factual existence of his *mens rea*. We disagree.

We held in *Johnson* that "this State does not recognize diminished capacity as a legal doctrine operating to negate specific criminal intent." 292 Md. at 418, 439 A.2d at 550. Consequently, we further held that "it was not error to exclude [mental impairment] evidence in support of [a diminished capacity defense]." *Id.*, 439 A.2d at 550. Petitioner reads *Johnson* as adopting the view that mental impairment evidence is only relevant to the defense of diminished capacity; therefore, when we upheld the exclusion of mental impairment evidence in relation to the diminished capacity defense, we necessarily upheld a categorical bar on all mental impairment evidence. Petitioner further argues that *Hoey* and *Simmons* set forth a new rule because those two decisions overruled *Johnson* and permitted the admission of such evidence for the purpose of proving imperfect self-defense.

In support of his reading of *Hoey* and *Simmons*, Petitioner points to our language in *Hoey* where we stated: "[W]e ... disapprove that portion of the *Johnson* opinion which indicated that a criminal defendant is not entitled to present evidence of his impaired mental condition for the limited purpose of showing the absence of *mens rea*," 311 Md. at 495 n. 5, 536 A.2d at 632 n. 5.; and, "[w]e now make indelibly clear that, where a particular mental element of a crime must be proved to establish the commission of a crime, evidence that it did not exist, whether due to mental impairment or some other reason relevant to that issue, is admissible," *id.* at 495, 536 A.2d at 633. Petitioner also directs us to our language in *Simmons* where we explained: "In *Hoey* ... we modified *Johnson* to allow a criminal defendant to present evidence of his impaired mental condition for the limited purpose of showing the absence of *mens rea*." 313 Md. at 39 n. 3, 542 A.2d at 1261 n. 3. Finally, Petitioner highlights that, in *Simmons*, we permitted the admission of mental impairment evidence offered for the express purpose of proving imperfect self-defense. *Id.* at 39, 542 A.2d at 1261.

Petitioner misreads *Johnson,* and in doing so misstates the effect upon *Johnson* of *Hoey* and *Simmons.* We addressed in *Johnson* a challenge to a trial court's exclusion of psychological evidence that demonstrated the defendant's insufficient mental capacity to form the requisite specific intent to commit first degree murder. 292 Md. at 417, 439 A.2d at 549. Johnson, who was on trial for first degree murder, first degree rape, kidnapping, and use of a handgun in the commission of a felony, *id.* at 408, 439 A.2d at 545, wished to call at trial a clinical psychologist to testify on his behalf, *id.* at 417, 439 A.2d at 549–50. Johnson's counsel proffered that the psychologist would testify about a report he prepared after evaluating the defendant, and the report would present evidence that went to "the mitigation of First Degree Murder and any specific [intent] crimes." *Id.,* 439 A.2d at 550 (alteration in original). The trial court permitted the psychologist to testify but limited the scope of the psychologist's testimony by allowing only portions of the report to be read into the record. *Id.,* 439 A.2d at 550. Johnson was convicted of murder and, on appeal, argued that it was error to exclude portions of the report from the record because the entire report was relevant to his defense of "diminished capacity." *Id.* at 417–18, 439 A.2d at 550. He argued, and we understood, the diminished capacity defense to be one in which the defendant attempts to show that an inherent mental defect rendered the defendant incapable of forming the specific intent required of the crime. *See id.* at 419, 439 A.2d at 550–51. We also recognized that, theretofore, the common law of Maryland had rejected the defense of diminished capacity, *id.* at 418–19, 439 A.2d at 550 (citing *Allen v. State,* 230 Md. 533, 188 A.2d 159 (1963), and *Armstead v. State,* 227 Md. 73, 175 A.2d 24 (1961)); hence Johnson strove both to have the defense recognized by judicial decision and to have evidence relating to the defense deemed legally relevant and admissible, *id.* at 417–18, 439 A.2d at 549–50.

We rejected Johnson's attempt to have us recognize the defense of diminished capacity, as part of our common law. We reasoned that the defense of diminished capacity is similar

to the defense of legal insanity (now known in Maryland as "lack of criminal responsibility"), in that acceptance of either defense "involve[s] a moral choice by the community to withhold a finding of responsibility and its consequence of punishment." *Id.* at 425, 439 A.2d at 554 (quoting *Bethea v. United States,* 365 A.2d 64, 90 n. 55 (D.C.App.1976)). We determined, though, upon a thorough survey of Maryland case law and legislative enactments, that, in Maryland, the sanity-insanity determination brooks no "intermediate" determination of diminished capacity. *Id.* at 421–26, 439 A.2d at 552–54. To that end, we added: "[T]he introduction of expert psychiatric testimony concerning the defendant's mental aberrations when the basic sanity of the accused is not at issue conflicts with the governing principle of the criminal law that all legally sane individuals are equally capable of forming and possessing the same types and degrees of intent." *Id.* at 420, 439 A.2d at 551.

We concluded in *Johnson* that recognition of the diminished capacity defense in Maryland could only be accomplished by legislative fiat. *Id.* at 425–26, 439 A.2d at 554. We therefore held that the trial court did not err in excluding evidence in support of "diminished capacity" as a means "to negate specific criminal intent." *Id.* at 418, 439 A.2d at 550. Put simply, the legal question for decision in that case, leading to those two holdings, was whether evidence of Johnson's mental impairment was excluded erroneously because it was relevant to his trial defense of diminished capacity. We recognized that to decide the question required that we "first examine whether the criminal defense known as 'diminished capacity' ... is recognized in this State." *Id.* at 418, 439 A.2d at 550. Our resolution of those issues—diminished capacity was not recognized, so the evidence was correctly excluded—constituted the entirety of the holding of the case; nothing else in the opinion created legally binding precedent. In short, the evidentiary rule set by *Johnson* was confined to prohibiting evidence of a mental impairment for the purpose of proving diminished capacity.

Our holding in *Johnson* did not reach, much less discuss and decide, whether evidence of a mental impairment could be offered to prove imperfect self-defense.   In fact, we made clear in *Johnson* that we were not deciding the admissibility of any evidence outside that specific variety offered to prove diminished capacity.   We made explicit our understanding of "a fundamental difference between evidence demonstrating that the defendant did not *as a fact* possess the requisite mental state, here premeditation and deliberation, as opposed to evidence establishing that the defendant was *generally less capable* than a normal person of forming a requisite *mens rea*." *Id.* at 426 n. 10, 439 A.2d at 554 n. 10. The admissibility of the former type of evidence remained untouched by the *Johnson* holding.   Indeed, we noted in *Johnson* that exclusion of evidence going to whether a defendant in fact possessed the requisite mental state would run afoul of "the basic proposition that the state must prove every element of a crime beyond a reasonable doubt, including specific intent, if necessary, and that an accused is entitled to rebut the state's case." *Id.,* 439 A.2d at 554 n. 10. *Johnson* declares the following: evidence of diminished capacity and its related mental impairment is off-limits in Maryland, unless and until the General Assembly enacts law that allows it;  yet, evidence of mental impairment offered to rebut, as a factual matter, the existence of *mens rea,* like that evidence offered in support of a theory of imperfect self-defense, necessarily is admissible.

Any editorial language from the portion of *Johnson* that reviewed prior case law, which could be read as barring the admission of all mental impairment evidence, is dicta.   This includes our statement that introduction of expert testimony pertaining to a mental defect when sanity is not at issue conflicts with basic precepts of criminal law.   Although that statement could lead to a myriad of legal conclusions, none of those conclusions held the force of law in Maryland after *Johnson,* because none of those conclusions derived from the facts, the issue presented, or the holding in that case.   Pertinent to this appeal, none of those myriad conclusions, including the one drawn by Petitioner (that *Johnson* barred the

admission of all mental impairment evidence), constitutes a "rule" for purposes of § 7–106(c). Petitioner therefore is mistaken in arguing that *Hoey* and *Simmons* overturned a "rule" of *Johnson* barring for all purposes the admission of mental impairment evidence, as no such rule can be read into the *Johnson* decision.

Rather, as the Court of Special Appeals saw it, both *Hoey* and *Simmons* "[f]ocus[ed] on certain sweeping language in the *Johnson* dicta," *Greco*, 199 Md.App. at 664, 24 A.3d at 145, and therefore did not provide a new rule in any sense of the words. In *Hoey* we held, *inter alia*, that it was constitutionally permissible to require a defendant to prove his lack of criminal responsibility, as long as the State retains the burden of proof on all elements of a crime, including the *mens rea* element. 311 Md. at 490–91, 536 A.2d at 630. In so holding, we noted that our decision emphasized the difference between mental impairment evidence that demonstrated the absence of *mens rea* and similar evidence that proved insanity (or diminished capacity). *Id.* at 494, 536 A.2d at 632. We criticized *Johnson* for its language that could be read as conflating the two and made explicitly clear, without substantive analysis, that mental impairment evidence proving the absence of the *mens rea* element of a crime is admissible. *Id.* at 494–95, 536 A.2d at 632–33.

Likewise, in *Simmons,* we held that the trial court erred in excluding psychiatric evidence offered by a defendant to prove imperfect self-defense. 313 Md. at 48, 542 A.2d at 1265. Our discussion of *Johnson* in that case was limited to a brief footnote in which we explained that "[i]n *Hoey* . . . we modified *Johnson* to allow a criminal defendant to present evidence of his impaired mental condition for the limited purpose of showing the absence of *mens rea.*" *Id.* at 39 n. 3, 542 A.2d at 1261 n. 3. We explained that, in light of *Hoey,* mental impairment evidence could be offered to prove imperfect self-defense. *Id.,* 542 A.2d at 1261 n. 3.

In relation to *Johnson, Hoey* and *Simmons* simply clarify a point of dicta. To repeat, *Johnson* was a case about diminish-

ed capacity and the mental impairment evidence used to prove that defense. *Hoey* and *Simmons* spoke of mental impairment evidence offered for the purpose of factually rebutting the existence of *mens rea*. The latter two cases could not, and did not, overrule any rule announced in the former case. *Hoey* "disapprove[d]" of language that "indicated" a certain legal conclusion; and purported "to make indelibly clear" an associated point of confusion. 311 Md. at 495, 495 n. 5, 536 A.2d at 632–33, 632 n. 5. *Simmons* only described *Hoey* in, admittedly, inartful terms. Neither case changed a rule of this State's common law by squarely overturning or reversing the holding of a prior decision.

We confirm our conclusion by noting that, prior to *Hoey* and *Simmons*, but subsequent to *Johnson*, courts in Maryland permitted the admission of mental impairment evidence for the purpose of factually disputing the *mens rea* element of a crime. In *Kanaras v. State*, the appellant, Kanaras, appealed his convictions for murder, housebreaking and theft, arguing, *inter alia*, that the trial court abused its discretion by excluding his psychiatric expert from "expressing opinions about whether appellant's psychological profile was consistent or inconsistent with voluntary participation in a violent crime." 54 Md.App. 568, 569–70, 460 A.2d 61, 63, *cert. denied*, 297 Md. 109 (1983). The Court of Special Appeals ultimately held that the exclusion was not an abuse of discretion because the proffered testimony offered an opinion on the ultimate issue in the case. *Id.* at 588, 460 A.2d at 73. The intermediate appellate court noted, however, that the trial court had permitted the expert to "testif[y] about the psychiatric makeup of the appellant which indicated that he was passive and easily led," suggesting, in turn, that the defendant did not possess the requisite intent for murder at the time of the offense. *Id.*, 460 A.2d at 73.

To like effect is *Cirincione v. State*, 75 Md.App. 166, 540 A.2d 1151 (1988), a case decided three months after *Hoey*, but before *Simmons*. In that case, the Court of Special Appeals affirmed the exclusion of expert testimony that offered an opinion as to the defendant's specific intent for the purpose of

proving the defense of intoxication, holding that such an opinion went towards an "ultimate fact." *Id.* at 182, 540 A.2d at 1159. In affirming the exclusion of that expert opinion, the court noted that the trial court had permitted some expert testimony, with the following parameter:

> What I think that the defendant [is attempting] to do in this case is to present evidence demonstrating that the defendant did not as a fact, and I underscore as a fact, possess the requisite mental state for first-degree murder which is premeditation and deliberation. I am sure that the State understands, as well as the defense, that the burden is on the State to prove every element of the crime of first-degree murder beyond a reasonable doubt and that will include specific intent. But the defendant had to rebut the State's case; that's what the defense seeks to do. I will allow the doctor to testify based on the evidence that is presently before the jury and not on any assumptions by the doctor, and that goes for Dr. Richmond if she testifies as well.

> So, I will say both doctors, each of them can give an opinion as to whether the defendant, because of substance abuse, was so intoxicated on the date of the incident that he possessed no reason or understanding at the time the alleged act occurred.

*Id.* at 179, 540 A.2d at 1158 (alteration in original). In essence, the trial court in *Cirincione* permitted, without rebuke from the Court of Special Appeals, the admission of mental impairment testimony for the purpose of rebutting the factual existence of *mens rea* for an intoxication defense.

In sum, there is no support for Petitioner's argument that, because of *Johnson,* mental impairment evidence offered to prove imperfect self-defense was categorically barred until *Johnson* was overruled by *Hoey* and *Simmons. Johnson* did not provide a holding on that rule, so *Hoey* and *Simmons* did not set forth a previously unrecognized view on that rule. We therefore hold that the "legal standard" set forth in *Hoey* and *Simmons* does not qualify as "not previously recognized" under § 7–106(c)(2)(i) of the UPPA. Petitioner may not rely on

that subsection to re-litigate the allegation that the trial court erred in 1982 by excluding his expert's testimony.[6]

## C.

■ Independent of whether the rule announced in *Hoey* and *Simmons* was not previously recognized, § 7–106(c)(2)(ii) also requires that the new rule affect the validity of the challenged conviction. In other words, assuming for the sake of argument that *Hoey* and *Simmons* presented a constitutional rule that was "not previously recognized," Petitioner would still have to identify how he was prejudiced by the *Johnson* rule in a way that would have been ameliorated by application of the standard set forth in *Hoey* and *Simmons*. *See* Md. Rule 4–402(a)(3) & (4) (providing that a petition for postconviction relief shall include "[t]he allegations of error upon which the petition is based" and "[a] concise statement of facts supporting the allegations of error"); *see also Fairbanks v. State*, 331 Md. 482, 486–87, 629 A.2d 63, 65 (1993) ("Because a facially valid conviction is entitled to a strong presumption of regularity, [established procedures for collaterally attacking a conviction, including the UPPA,] clearly place[ ] the burden of proof where it should be—upon the defendant attacking the conviction.").

To carry that burden, Petitioner alleged in his amended petition for postconviction relief that the trial court, relying on *Johnson*, excluded Petitioner's expert's testimony. According to Petitioner, he was foreclosed from relating his phobia of blood to his violent actions because his expert was precluded from testifying about that phobia and its resultant effects. Petitioner's allegation can be summed up in the assertion that he was severely limited in putting on his theory of imperfect self-defense because his psychiatric expert's testimony was

---

**6.** We repeat, it is unnecessary to decide, and so we do not decide, also whether, as required by § 7–106(c)(i) of the UPPA, the legal standard set forth in *Hoey* and *Simmons* is one that "the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings."

excluded from trial. The postconviction court agreed with Petitioner, noting in its order that "[Petitioner's] expert's testimony was significantly excluded and limited from being presented to the fact-finder to the point that it did not support the [P]etitioner's claim of imperfect self-defense."

The transcript of Petitioner's trial reveals that his expert, Dr. Rothstein, was not restricted from expressing an opinion on Petitioner's mental impairment and the effect that mental impairment had on Petitioner's actions. After the trial court ruled on the scope of Dr. Rothstein's testimony, the doctor testified that, consistent with his own diagnosis, Petitioner was found at the age of 16 or 17 to suffer from a "phobic response to the threat of bodily harm and to blood." The doctor further testified that, given a hypothetical scenario identical to Petitioner's version of events, Petitioner's violent reaction of strangling Ms. Larsen was "consistent with some of the features of the operation of a phobic reaction." When asked to explain what he meant by that, Dr. Rothstein responded:

The feature that is most directly a product of the phobic response would in that situation be the fainting upon being presented with the stimulus, the combined stimuli of the sight of blood and the perception that someone was attacking him. That would be perceived as a threat.

\* \* \*

That would be perceived as a threat of bodily harm. The second way in which it would be consistent would be that in the case of somebody who faints as a result of a phobic response to a specific stimulus or indeed anyone who experiences a fainting episode, that there is a brief period following the recovery from the fainting episode during which there is some residual confusion and unclarity of thinking. And that particular state of mind would contribute to the possibility of a misappraisal or misevaluation of what was being seen. That coupled with the fact that the person's particular emotional response to the threat of bodily harm would tend to result in the combination of the misperception and the overreaction to that which was misperceived.

Regardless of the trial court's evidentiary ruling based on *Johnson* that Petitioner would not be allowed to present evidence of diminished capacity, Petitioner was not precluded from offering evidence of his mental impairment in support of his defense of imperfect self-defense. Through Dr. Rothstein, Petitioner offered evidence of the existence of his phobia and the violent effect that phobia could have on someone in Petitioner's situation. More to the point, Dr. Rothstein essentially explained that Petitioner's phobia could cause an episode of imperfect self-defense: a misperception of a threat and a violent overreaction to that misperception. The jury simply remained unconvinced by the weight of Dr. Rothstein's testimony and Petitioner's defense theory.

In effect, *Johnson's* alleged bar on mental impairment evidence had no effect on the evidence that, in the end, was presented at Petitioner's trial. Consequently, Petitioner would not move into evidence any more expert testimony in support of imperfect self-defense under the rule of *Hoey* and *Simmons* than he did in 1982 under the court's understanding of *Johnson*. We therefore hold that Petitioner's claim for postconviction relief further fails because Petitioner was not prejudiced by any rule laid out in *Johnson*, so the validity of his conviction would not be affected by the evidentiary rule of *Hoey* and *Simmons*.

## IV.

### A.

Because we have held that Petitioner was not entitled to postconviction relief, Petitioner's allegation that he received an illegal sentence remains at issue. We therefore turn to address preliminarily whether we should review Petitioner's allegedly illegal sentence now, even though a separate appeal of that sentence remains pending in the Court of Special Appeals.

Petitioner first asserts that review of his allegedly illegal sentence at this juncture is proper because an illegal sentence may be corrected at any time. Moreover, Petitioner asserts,

review is proper because he included this allegation in the Petition for Writ of Certiorari he filed with this Court, which we granted without limiting or qualifying in any way the issues presented.[7]

The State argues that we should decline to review Petitioner's allegedly illegal sentence. The State asserts that Petitioner "largely created and benefitted from" the sentencing error and postponed challenging that illegality until the State sought leave to appeal the postconviction ruling. The State further argues that this Court should not review the allegedly illegal sentence because the challenge is unrelated to the postconviction issue and is "currently pending as a separate action in the Court of Special Appeals that this Court has expressly rejected for inclusion in its grant of certiorari review in the present case."

We are not persuaded by the State's arguments that we should decline to review Petitioner's allegedly illegal sentence. First, Petitioner's allegation that he received an illegal sentence relies on this Court's holding in *Cathcart v. State*, 397 Md. 320, 916 A.2d 1008 (2007), discussed *infra*. *Cathcart* was filed nine years after the 1998 modification of Petitioner's sentence to its present form. Therefore, we find no merit in the State's position that Petitioner has waited purposefully since 1998 to raise a challenge. Moreover, the State's argument is essentially a laches argument, which is not available in the context of a motion to correct an illegal sentence because an illegal sentence can be corrected "at any time." Md. Rule 4–345(a). Finally, the fact that this particular issue is already before the Court of Special Appeals—effectively stayed pend-

---

7. Petitioner also asserts that "the Court may decide an unpreserved issue 'if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal'" and that deciding this issue would serve both purposes. (Quoting Md. Rule 8–131(a)). We need not address this argument because we have held consistently that waiver principles do not apply to allegations of substantively illegal sentences. *See, e.g., Walczak v. State*, 302 Md. 422, 427, 488 A.2d 949, 951 (1985) (holding that "a defendant who fails to object to the imposition of an illegal sentence does not waive forever his right to challenge that sentence").

ing our decision—lends support for this Court to review the challenge to the sentence without further delay, for the purpose of efficiency and complete resolution.

### B.

Because *Cathcart* is crucial to much of Petitioner's argument, we review it in some detail. In *Cathcart*, we considered whether a sentence of life, suspend all but ten years, with no successive period of probation, imposed for the common law offense of false imprisonment, was illegal. 397 Md. at 322–23, 916 A.2d at 1010. Cathcart argued that the sentence was illegal because imposing a life sentence without the authority to impose the suspended portion had the effect of precluding him from parole consideration for twenty years.[8] We rejected his contention that the sentence was illegal for the mere fact that no probationary period had been imposed to follow the unsuspended portion. *Id.* at 325, 916 A.2d at 1011. This was so because "the sentence imposed for false imprisonment, despite its wording, *was not a life sentence and ha[d] no attribute or collateral consequence of a life sentence.*" *Id.*, 916 A.2d at 1011 (emphasis added). We explained that a split sentence approach may be used in connection with a life sentence, but that, "[i]f a court chooses to use that approach, ... it must comply with the requirements of [CP § 6–222[9]],

---

8.  Cathcart asserted that, because he was serving a life sentence, he had to serve 15 years before he was eligible for parole plus an additional five years for his related assault conviction. Therefore, although Cathcart was sentenced to serve ten years of executed time, he would not have been eligible for parole during the executed portion of his sentence (until after serving twenty years). *Cathcart v. State*, 397 Md. 320, 324 n. 2, 916 A.2d 1008, 1011 n. 2 (2007).

9.  CP § 6–222, "Limits on probation after judgment; extension for restitution," provides, in pertinent part:

   (a) *Limits on probation after judgment.*—A circuit court or the District Court may:
   (1) impose a sentence for a specified time and provide that a lesser time be served in confinement;
   (2) suspend the remainder of the sentence; and
   (3)(i) order probation for a time longer than the sentence but, subject to subsections (b) and (c) of this section, not longer than:

one of which is that there must be a period of probation attached to the suspended part of the sentence." *Id.* at 327, 916 A.2d at 1012.

We concluded, therefore, that the "[f]ailure to impose a period of probation does not necessarily make the sentence illegal but simply precludes it from having the status of a split sentence." *Id.* at 330, 916 A.2d at 1014. Moreover, "[b]ecause the effect of the omission is to limit the period of incarceration to the unsuspended part of the sentence, that becomes, in law, the effective sentence." *Id.*, 916 A.2d at 1014. We also rejected the proposition that a court that had failed "to impose a period of probation and thereby limited the period of incarceration to the unsuspended portion of the sentence" would be permitted to increase that sentence on remand, generally because "our jurisprudence does not allow for that." *Id.*, 916 A.2d at 1014.

### *First Degree Murder*

We now turn to Petitioner and the State's respective positions in connection with, first, the sentence for first degree premeditated murder. Petitioner's argument stems from the unusual circumstances that led to the sentence currently in place for that crime. He asserts that his life sentence for first degree premeditated murder, with all but fifty years suspended and no period of probation, was converted by operation of law into a fifty-year term-of-years sentence, pursuant to our holding in *Cathcart.* Because the statutorily prescribed penalty for first degree murder is, at a minimum, life imprisonment (although the court may exercise its discretion and suspend any portion thereof), a fifty-year term-of-years sentence is illegal because it is not authorized by statute. According to Petitioner, because the Circuit Court may not impose a more severe sentence on remand, pursuant to Maryland Code (1974, 2006 Repl.Vol.), § 12–702(b) of the Courts and Judicial Pro-

---

1. 5 years if the probation is ordered by a circuit court; or
2. 3 years if the probation is ordered by the District Court[.]

ceedings Article (CJ),[10] the court is prohibited from imposing the minimum statutorily prescribed sentence of life imprisonment. Instead, Petitioner continues, the Circuit Court may impose a sentence statutorily prescribed for *second degree murder*; this is so because first degree and second degree murder are not separate crimes, but rather statutory subparts of the same common law offense. Therefore, Petitioner concludes, the maximum sentence that may be imposed on remand, after vacating Petitioner's illegal fifty-year sentence, is a thirty-year sentence.

The State concedes that a fifty-year term-of-years sentence for first degree murder is illegal, acknowledging that the minimum sentence permitted by statute is life imprisonment and recognizing that "the unsuspended 50–year term in this case was imposed illegally." The State argues nevertheless that, *should* we conclude that Petitioner's sentence is illegal, "this Court should, at most, strike the illegality and remand to the circuit court to determine the appropriate and legal sentences." The State distinguishes the matter *sub judice* from *Cathcart* because, in that case, the unsuspended portion of the split sentence (ten years), when taken as a term-of-years sentence, was not an illegal sentence for Cathcart's conviction. In this case, however, a fifty-year sentence is illegal. The State argues, therefore, that, on remand, imposing an "increase of sentence" to life imprisonment, or life imprisonment

---

**10.** Maryland Code (1974, 2006 Repl.Vol.), § 12–702 of the Courts and Judicial Proceedings Article (CJ) provides, in pertinent part:

(b) *Remand for sentence or new trial; limitations on increases in sentences.*

—If an appellate court remands a criminal case to a lower court in order that the lower court may pronounce the proper judgment or sentence, or conduct a new trial, and if there is a conviction following this new trial, the lower court may impose any sentence authorized by law to be imposed as punishment for the offense. However, it may not impose a sentence more severe than the sentence previously imposed for the offense unless:

(1) The reasons for the increased sentence affirmatively appear;
(2) The reasons are based upon additional objective information concerning identifiable conduct on the part of the defendant; and
(3) The factual data upon which the increased sentence is based appears as part of the record.

with a fixed unsuspended portion and probation, would not be improper.

Petitioner presents a creative argument, although one to which we cannot subscribe, as Maryland law provides otherwise. Preliminarily, we do agree with Petitioner, and presumably with the State as well, that *Cathcart* applies to convert his sentence by operation of law to a fifty-year sentence. We find no indication in *Cathcart* that its application should be limited to cases in which the converted sentence would be a legal sentence. That is, a split sentence imposed without a period of probation to follow lacks the attributes of a split sentence, regardless of whether the resulting term-of-years sentence would be legal or illegal. The pertinent question in cases in which converting the unsuspended portion of a sentence into a term-of-years sentence would render it illegal, such as in the matter *sub judice*, concerns the authority of the court to correct the illegality arising from the conversion. We begin by considering a line of cases concerning the sentencing court's power with respect to correcting illegal sentences, pursuant to Maryland Rule 4–345(a).

In *Hoile v. State*, 404 Md. 591, 948 A.2d 30 (2008), we explained the extent of a sentencing court's power to correct illegal sentences pursuant to Rule 4–345(a), particularly as compared to the court's authority to modify a sentence pursuant to other subsections of the Rule. Hoile pleaded guilty to first degree assault and was sentenced to fifteen years in prison, all suspended, with five years of probation. *Id.* at 597, 948 A.2d at 34. Three years later, Hoile violated his probation, and the court sentenced him to serve the original previously suspended sentence. *Id.*, 948 A.2d at 34. Upon Hoile's request, the court reconsidered the sentence and reduced it to "time served and placed Hoile on five years of supervised probation." *Id.* at 598, 948 A.2d at 34. The victim of Hoile's assault thereafter informed the court that she was never notified of the resentencing hearing, in violation of Maryland statutes and rules. *Id.* at 598–99, 948 A.2d at 34–35. In response, the sentencing court vacated the "altered sentence," *id.* at 600–01, 948 A.2d at 36, which, in effect, "reinstated the

immediate prior sentence (the [fifteen-year sentence] imposed upon finding a violation of probation)." *Id.* at 601, 948 A.2d at 36. Before this Court, Hoile argued that the vacation and reinstatement effected an impermissible increase of his sentence; that is, the increase was impermissible because the court could only increase a sentence if the sentence was illegal and the sentence the court vacated in his case was not rendered illegal by the lack of notice to the victim. *Id.* at 619–20, 948 A.2d at 47.

In response to Hoile's arguments, we first commented that "[t]he correction of an illegal sentence may result in an increase over the erroneous sentence previously imposed on the defendant." *Id.* at 620, 948 A.2d at 47–48. We then explained that an "illegal sentence" was "a sentence 'not permitted by law.'" *Id.* at 621, 948 A.2d at 48 (quoting *Walczak v. State*, 302 Md. 422, 427, 488 A.2d 949, 951 (1985)). We agreed with Hoile that the sentence imposed without notice to the victim was not illegal. *Id.* at 623, 948 A.2d at 49. We then discussed the distinction between the court's revisory power pursuant to Rule 4–345(a), to correct illegal sentences, and other subsections of that rule, stating that "under [Rule 4–345(a)] a court may increase a sentence" while "under [the other subsections] a court may not." *Id.* at 626, 948 A.2d at 51. We held that the court acted beyond its authority when it increased Hoile's sentence by vacating the prior sentence imposed, which was an otherwise-legal sentence composed of time served plus a period of probation. *Id.* at 623–24, 948 A.2d at 49–50. Therefore, Hoile was entitled to have the fifteen-year sentence vacated and the sentence of probation reimposed. *Id.* at 629–30, 948 A.2d at 53.

We considered specifically in *Hoile* whether the trial court, not acting after an appeal, permissibly could increase a defendant's sentence if the sentence being modified was not illegal. This factual scenario would not trigger the prohibition on increased sentences pursuant to CJ § 12–702(b), which Petitioner asserts imposes a limit on the trial court's discretion to resentence him on remand. We disagree with Petitioner's assessment of the limitations on the sentencing court to

correct an illegal sentence on remand. We conclude that Maryland law does not set a previously imposed, illegal sentence as the upper bound for the sentence that a trial court may impose to correct an illegal sentence after remand from the Court of Special Appeals or this Court. Rather, the sentencing court must look through the illegal sentence to a previous lawful sentence imposed, if any, to determine the maximum sentence that may be imposed on remand. Alternatively, the trial court must remove the illegality, with the resulting legal sentence serving as the maximum for purposes of resentencing.

In *Dixon v. State*, 364 Md. 209, 213, 772 A.2d 283, 285 (2001), we considered whether the sentencing court imposed illegally a more severe sentence upon retrial and conviction after Dixon's successful appeal. Relevant here, Dixon's first trial resulted in a conviction for attempted voluntary manslaughter and first degree assault. *Id.* at 213, 772 A.2d at 285. The trial court imposed separate sentences for each conviction: twenty years' imprisonment for first degree assault and ten years' imprisonment for attempted voluntary manslaughter, to be served concurrently. *Id.* at 214–15, 772 A.2d at 286. The Court of Special Appeals, resolving an issue unrelated to the matter now before this Court, directed that the convictions be vacated and remanded for a new trial. *Id.* at 215, 772 A.2d at 286. The intermediate appellate court, for guidance, also considered "whether 'the trial court err[ed] by imposing separate sentences upon the convictions for first degree assault and attempted manslaughter.'" *Id.*, 772 A.2d at 286–87 (alteration in original). Dixon argued that "the first degree assault conviction merged into the attempted voluntary manslaughter conviction." *Id.*, 772 A.2d at 286–87. The intermediate appellate court concluded that first degree assault indeed would merge into attempted voluntary manslaughter. *Id.* at 218, 772 A.2d at 288.

Upon retrial, at the conclusion of the evidence, the State was permitted to enter *nolle prosequi* as to the attempted voluntary manslaughter charge. *Id.*, 772 A.2d at 288. Dixon was convicted again of first degree assault and sentenced to

twenty years, as he had been at his first trial. *Id.* at 221, 772 A.2d at 289. Dixon's appeal eventually arrived in this Court. Noting that Dixon's conviction for first degree assault merged into the conviction for attempted voluntary manslaughter, at his first trial,[11] *id.* at 248, 772 A.2d at 306, we concluded that the maximum *legal* sentence that he *could have received* at the first trial was based on the maximum penalty for the greater offense of attempted voluntary manslaughter, *i.e.*, ten years, *id.* at 225, 772 A.2d at 292. We held that, "[i]n sentencing at the second trial, the trial judge should have been restricted in his sentence for the first degree assault conviction by the ten year sentence for attempted voluntary manslaughter." *Id.*, 772 A.2d at 292. "Because the sentence from the first trial was illegal, the trial court was bound in its sentencing in the second trial by *what would have been the legal sentence* of ten years." *Id.*, 772 A.2d at 292 (emphasis added).

To arrive at our conclusion that the maximum sentence Dixon could have received after remand and upon reconviction was based on the *maximum legal sentence* that could have been imposed originally, not on the sentence that actually was imposed, we discussed CJ § 12–702(b) at length. We agreed with Dixon's interpretation of that statute, "mandat[ing] that the sentencing following the second trial be circumscribed by a lawful sentence resulting from the first trial." *Id.* at 228, 772 A.2d at 294. Because the new sentence must be "authorized by law," it "must be based on a sentence that was legal when 'previously imposed.' " *Id.*, 772 A.2d at 294. We reasoned that the statute could not be interpreted so as to permit a trial court to impose "illegal sentences ad infinitum." *Id.* at 230–31, 772 A.2d at 295–96. In adopting this view, we quoted the hypothetical scenario Dixon provided to this Court to highlight the anomaly of allowing the trial court to impose another illegal sentence on remand:

A defendant is convicted by a jury of involuntary manslaughter and use of a handgun in the commission of a crime

---

**11.** The nuances of the analysis with respect to merger are not relevant to the matter *sub judice.*

of violence. The trial court sentences the defendant to three years imprisonment for involuntary manslaughter. On the use of a handgun count, the court imposes a concurrent three year term despite the fact that Art. 27, § 36B(d) mandates a sentence of not less than 5 years without parole. The defendant appeals, and the Court of Special Appeals orders a new trial. At the new trial, the defendant is again convicted of involuntary manslaughter and use of a handgun.

Accepting the State's premise that for the purposes of [CJ] § 12–702(b) "the sentence previously imposed" is the sentence that was actually imposed even if that sentence is illegal, the trial court cannot impose a sentence more severe than three years for use of a handgun. The Legislature plainly did not intend this result, which would defeat the mandate of § 36B(d). *The sentence actually imposed by the trial court cannot operate as a sentencing cap under [CJ] § 12–702(b) if it is more severe than the maximum sentence authorized by law or less severe than the minimum sentence required by law, regardless of whether the illegality favors the State or the defendant.*

*Id.* at 230, 772 A.2d at 295 (alterations in original) (emphasis added). Certainly the sentence imposed originally on Dixon was greater than the maximum legal sentence, the reverse of the circumstances in the matter *sub judice.* The same reasoning applies, however, because allowing the previously imposed illegal sentence (because it fell below the minimum sentence provided by statute) to serve as the maximum sentence upon remand not only permits but requires the trial court to impose "illegal sentences ad infinitum." Therefore, we hold that, upon resentencing, on remand after appeal to correct an illegal sentence, the sentencing court may not sentence in excess of what the prior maximum legal sentence would have been, to comply with CJ § 12–702(b).[12]

---

12. We have rejected Petitioner's argument that a fifty-year term-of-years sentence serves as the maximum sentence that the court could impose on remand. Therefore, we need not consider his ensuing

■  Moreover, the policy undergirding CJ § 12–702(b), to protect a defendant against the potential for vindictiveness on the part of the sentencing judge, *see Dixon, supra,* is not implicated when the sentencing court acts to correct an illegality and resentences pursuant to the appellate court's specific

argument in which he recognizes that the court must impose an "authorized" sentence and requests that the court impose a maximum thirty-year term-of-years sentence statutorily authorized for second-degree murder. As Petitioner has made substantial arguments in this regard, we shall briefly discuss the fallacy of the analysis. While Petitioner's statement that murder is a single common law offense, separated out into statutory degrees is true, *see Campbell v. State,* 293 Md. 438, 441, 444 A.2d 1034, 1036 (1982), it is also true that the legislature distinguished the degrees *for purposes of authorizing separate penalties based on the severity of the conduct.* To hold that a thirty-year term-of-years sentence is an authorized sentence for first degree murder would nullify the legislature's decision to distinguish between first and second degree murder for sentencing purposes. That is, the Circuit Court is not statutorily authorized to impose a sentence of thirty years on a defendant who has been convicted of first degree murder. Such an interpretation would contravene the plain language of the penalty provision of the first degree murder statute, *§ 2–201(b)(1) of the Mary*-land Code (2002, 2012 Repl.Vol.), Criminal Law Article (CL), providing that "[a] person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to: (i) death; (ii) imprison-ment for life without the possibility of parole; or (iii) imprisonment for life."

Petitioner relies on our recent decision in *State v. Goldsberry,* 419 Md. 100, 18 A.3d 836 (2011), for support that a thirty-year term-of-years sentence is "authorized by law." We reject this interpretation because we did not consider that specific issue in *Goldsberry.* In that case, Goldsberry was originally tried on charges of both first degree and second degree felony murder, and the trial judge instructed the jury as to both, though the facts only supported a conviction of first degree felony murder. *Id.* at 133–34, 18 A.3d at 856. Goldsberry was only convicted of second degree felony murder, for which he was sentenced to the statutory maximum of thirty years. *Id.* at 113, 18 A.3d at 844. We held that, "when . . . the facts make out *only* a charge of first degree felony murder, a trial court errs in instructing the jury on the crime of second degree felony murder." *Id.* at 136, 18 A.3d at 858. That the trial court erred when it instructed as to second degree murder, in addition to first degree, did not absolve Goldsberry of the jury's finding that he committed felony murder, and he could be retried on a first degree felony murder charge. *Id.* at 137, 18 A.3d at 858. In that context, Petitioner was entitled to a "windfall" maximum sentence of thirty years. *Id.* at 137, 18 A.3d at 858. Moreover, we noted that the trial court's limitations were "demanded by the peculiar circumstances of this case." *Id.* at 117, 18 A.3d at 846.

instructions for remand. In that regard, this Court is limiting the sentencing court's discretion to sentence, thereby protecting against the threat of vindictiveness. Likewise, when the Circuit Court imposes a more severe sentence than the previously illegal sentence on remand, it is because this Court has directed it to do so, given that the Circuit Court had no authority to impose the original illegal sentence in the first instance. Indeed, this is not the first instance in which this Court has entered a mandate to reinstate a prior, more severe sentence. *See, e.g., State v. Hannah,* 307 Md. 390, 403, 514 A.2d 16, 22 (1986) (remanding for the Circuit Court to impose a mandatory minimum sentence where the trial court had previously struck the conviction and imposed probation before judgment); *State ex rel. Sonner v. Shearin,* 272 Md. 502, 526, 325 A.2d 573, 586 (1974) (remanding the case and instructing the Circuit Court to "delete the improper suspension of sentence so that the handgun violation will be for the mandatory term of five years").

■ In sum, Petitioner's previously imposed sentence for first degree premeditated murder of life, suspend all but fifty years, was converted by operation of law into a term-of-years sentence of fifty years imprisonment. That converted sentence was not authorized by statute; therefore, it was illegal. On remand, the Circuit Court is limited by the maximum legal sentence that could have been imposed, with the illegality removed. That is, the Circuit Court must impose a sentence of life imprisonment, all but fifty years suspended, to be followed by some period of probation.

### *First degree rape*

Petitioner also contends that his fifty-year sentence for first degree rape, after application of the rule of *Cathcart,* is illegal because it exceeds his life expectancy. He argues that the Circuit Court was required to "determine that the sentence was lower than a reasonable estimate of the defendant's natural life" before imposing a term-of-years sentence pursuant to former Article 27, § 462, the statute under which Petitioner was convicted, because that section provided for a

maximum sentence of "the period of [the defendant's] natural life." Alternatively, Petitioner suggests that a forty-year sentence would be proper, based on the maximum term-of-years sentence provided for in the Maryland Sentencing Guidelines, as well as figures provided by the United States Sentencing Commission. The State disagrees, although it merely asserts that Petitioner's current fifty-year sentence is legal.

■ We begin by recognizing that, regardless of the length of a term-of-years sentence, it is impossible for a defendant to serve a period of incarceration longer than the balance of his natural life. That is, whether a sentence of fifty years of incarceration is longer than the balance of a defendant's natural life is irrelevant, strictly speaking, because the sentence will be complete at the end of the defendant's life, even if years remain on the term-of-years sentence. There are practical distinctions, however, between a term-of-years sentence and a life sentence. Specifically, Maryland statutes treat life sentences differently for purposes of parole eligibility. *Compare* Md.Code (1999, 2008 Repl. Vol. 2011 Supp.), § 7–301(d) of the Correctional Services Article (CS) (limiting parole eligibility for an inmate sentenced to life imprisonment until the inmate has served in confinement fifteen years, and twenty-five years for an inmate sentenced to life imprisonment when the State sought life without parole or death) *with* CS § 7–301(b) (generally providing for parole eligibility once an inmate has served in confinement one-fourth of the aggregate sentence imposed). Additionally, unlike a defendant serving a term-of-years sentence, a defendant serving a life sentence, once eligible for parole, may only be paroled with the approval of the Governor. CS § 7–301(d)(4)–(5).

Authorities from other jurisdictions support, or are in accord, with our conclusion. *See, e.g., Alvarez v. State*, 358 So.2d 10, 12–13 (Fla.1978) (rejecting the argument "that an individual's life expectancy should be used ... to mark the longest term which a particular defendant should serve" and holding that a 125–year sentence did not exceed the statutory maximum of life under the sentencing statute because the

practical effect of the sentence was no worse than a life sentence); *People v. Robinson*, 172 Mich.App. 650, 432 N.W.2d 390, 391–92 (1988) (holding that sentence of eighty-to-one-hundred-twenty years exceeded the maximum life sentence because the defendant would not be eligible for parole until having served eighty years, which exceeded his life expectancy and was longer than he would have had to serve before becoming eligible for parole if he had received a life sentence).

We are not persuaded by Petitioner's assertion that determining his life expectancy is necessary to determine what sentence would be less than life.[13] In that vein, the Court of Special Appeals's decision in *Coley v. State*, 76 Md.App. 731, 737, 548 A.2d 161, 164 (1988), upon which Petitioner relies, is inapplicable. In that case, the Circuit Court originally sentenced defendant Coley to a life sentence, with fifteen years suspended. *Id.* at 733, 548 A.2d at 162. After a successful appeal, the sentencing court imposed a life sentence, with no portion suspended, because the court did not have "all the same feelings" at the time of resentencing as it had at the original proceeding. *Id.* at 734, 548 A.2d at 163. The intermediate appellate court concluded that the sentencing court had intended originally to impose less than a life sentence, so the life sentence imposed on remand was an illegal increase. *Id.* at 735–36, 548 A.2d at 163–64. The intermediate appellate court determined that the challenge on remand would be to determine the upper limit of the sentence that could be

---

**13.** Petitioner emphasizes that the statute under which he was convicted, former Article 27, § 462, established the maximum penalty as "the period of [the defendant's] natural life," asserting that the statute necessarily required consideration of that particular defendant's life expectancy. Petitioner, however, does not provide any authority to support that the language utilized in § 462 differs substantively from the language of "life imprisonment," which is the language employed in the cases he cites and is reflected in the current language of the statute. We see none. And, the 2002 recodification of former Article 27, § 462 supports our conclusion. 2002 Md. Laws, ch. 26. When former Article 27, § 462 was repealed and reenacted as CL § 3–303, it was done so without substantive change. *Id.* Section 3–303 abandoned the language "for the period of his natural life" and replaced it with the maximum penalty of "imprisonment not exceeding life."

imposed, provided the indefiniteness of the original sentence of life with fifteen years suspended. *Id.* at 737, 548 A.2d at 164. To that end, the intermediate appellate court suggested that the sentencing court consider taking evidence as to Coley's life expectancy; subtract fifteen years; and impose a life sentence with all but the difference suspended. *Id.,* 548 A.2d at 164. *Coley* is inapplicable in the present case because, unlike here, the sentence in that case was vague and indefinite, having no numerical value attributed to it.

We hold, then, that Petitioner's effective sentence of fifty-years does not exceed the statutory maximum of "the period of his natural life" and, therefore, is not an illegal sentence.

## V.

In conclusion, we hold that: the Court of Special Appeals properly entertained the State's appeal; Petitioner was not entitled to postconviction relief; and Petitioner's fifty year sentence for first degree premeditated murder was illegal, but the fifty-year sentence for first degree rape was not.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT OF BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. TWO-THIRDS OF THE COSTS IN THIS COURT AND THE FULL COSTS IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**